## TURNER ET AL. *v.* SAFLEY ET AL.

No. 85–1384.  Argued January 13, 1987—Decided June 1, 1987

O'CONNOR, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and WHITE, POWELL, and SCALIA, JJ., joined, and in Part III–B of which BRENNAN, MARSHALL, BLACKMUN, and STEVENS, JJ., joined. STEVENS, J., filed an opinion concurring in part and dissenting in part, in which BRENNAN, MARSHALL, and BLACKMUN, JJ., joined, *post*, p. 100.

*Henry T. Herschel*, Assistant Attorney General of Missouri, argued the cause for petitioners. With him on the briefs were *William L. Webster*, Attorney General, and *Michael L. Boicourt.*

*Floyd R. Finch, Jr.*, argued the cause and filed a brief for respondents.*

---

*Briefs of *amici curiae* urging reversal were filed for the United States by *Solicitor General Fried, Assistant Attorney General Trott, Deputy Solicitor General Cohen,* and *Roger Clegg;* and for the State of Arkansas et al. by *Thomas J. Miller*, Attorney General of Iowa, *Brent R. Appel*, Deputy Attorney General, *John Steven Clark*, Attorney General of Arkansas, *John K. Van de Kamp*, Attorney General of California, *Lacy H. Thornburg*, Attorney General of North Carolina, *Nicholas Spaeth*, Attorney General of North Dakota, *T. Travis Medlock*, Attorney General of South Carolina, *Mark V. Meierhenry*, Attorney General of South Dakota, *Gerald L. Baliles*, Attorney General of Virginia, and *Robert M. Spire*, Attorney General of Nebraska.

Briefs of *amici curiae* urging affirmance were filed for the Correctional Association of New York by *John H. Hall* and *Steven Klugman;* for Prisoners' Legal Services of New York, Inc., et al. by *Robert Selcov;* and for Guadalupe Guajardo, Jr., et al. by *Harry M. Reasoner* and *Ann Lents.*

*Jim Mattox*, Attorney General of Texas, *Mary F. Keller*, Executive Assistant Attorney General, and *F. Scott McCown* and *Michael F. Lynch*, Assistant Attorneys General, filed a brief for the State of Texas as *amicus curiae.*

JUSTICE O'CONNOR delivered the opinion of the Court.

This case requires us to determine the constitutionality of regulations promulgated by the Missouri Division of Corrections relating to inmate marriages and inmate-to-inmate correspondence. The Court of Appeals for the Eighth Circuit, applying a strict scrutiny analysis, concluded that the regulations violate respondents' constitutional rights. We hold that a lesser standard of scrutiny is appropriate in determining the constitutionality of the prison rules. Applying that standard, we uphold the validity of the correspondence regulation, but we conclude that the marriage restriction cannot be sustained.

I

Respondents brought this class action for injunctive relief and damages in the United States District Court for the Western District of Missouri. The regulations challenged in the complaint were in effect at all prisons within the jurisdiction of the Missouri Division of Corrections. This litigation focused, however, on practices at the Renz Correctional Institution (Renz), located in Cedar City, Missouri. The Renz prison population includes both male and female prisoners of varying security levels. Most of the female prisoners at Renz are classified as medium or maximum security inmates, while most of the male prisoners are classified as minimum security offenders. Renz is used on occasion to provide protective custody for inmates from other prisons in the Missouri system. The facility originally was built as a minimum security prison farm, and it still has a minimum security perimeter without guard towers or walls.

Two regulations are at issue here. The first of the challenged regulations relates to correspondence between inmates at different institutions. It permits such correspondence "with immediate family members who are inmates in other correctional institutions," and it permits correspondence between inmates "concerning legal matters." Other correspondence between inmates, however, is permitted only

if "the classification/treatment team of each inmate deems it in the best interest of the parties involved." App. 34. Trial testimony indicated that as a matter of practice, the determination whether to permit inmates to correspond was based on team members' familiarity with the progress reports, conduct violations, and psychological reports in the inmates' files rather than on individual review of each piece of mail. See 777 F. 2d 1307, 1308 (CA8 1985). At Renz, the District Court found that the rule "as practiced is that inmates may not write non-family inmates." 586 F. Supp. 589, 591 (WD Mo. 1984).

The challenged marriage regulation, which was promulgated while this litigation was pending, permits an inmate to marry only with the permission of the superintendent of the prison, and provides that such approval should be given only "when there are compelling reasons to do so." App. 47. The term "compelling" is not defined, but prison officials testified at trial that generally only a pregnancy or the birth of an illegitimate child would be considered a compelling reason. See 586 F. Supp., at 592. Prior to the promulgation of this rule, the applicable regulation did not obligate Missouri Division of Corrections officials to assist an inmate who wanted to get married, but it also did not specifically authorize the superintendent of an institution to prohibit inmates from getting married. *Ibid.*

The District Court certified respondents as a class pursuant to Federal Rule of Civil Procedure 23. The class certified by the District Court includes "persons who either are or may be confined to the Renz Correctional Center and who desire to correspond with inmates at other Missouri correctional facilities." It also encompasses a broader group of persons "who desire to . . . marry inmates of Missouri correctional institutions and whose rights of . . . marriage have been or will be violated by employees of the Missouri Division of Corrections." See App. 21–22.

The District Court issued a memorandum opinion and order finding both the correspondence and marriage regulations unconstitutional. The court, relying on *Procunier* v. *Martinez*, 416 U. S. 396, 413–414 (1974), applied a strict scrutiny standard. It held the marriage regulation to be an unconstitutional infringement upon the fundamental right to marry because it was far more restrictive than was either reasonable or essential for the protection of the State's interests in security and rehabilitation. 586 F. Supp., at 594. The correspondence regulation also was unnecessarily broad, the court concluded, because prison officials could effectively cope with the security problems raised by inmate-to-inmate correspondence through less restrictive means, such as scanning the mail of potentially troublesome inmates. *Id.*, at 596. The District Court also held that the correspondence regulation had been applied in an arbitrary and capricious manner.

The Court of Appeals for the Eighth Circuit affirmed. 777 F. 2d 1307 (1985). The Court of Appeals held that the District Court properly used strict scrutiny in evaluating the constitutionality of the Missouri correspondence and marriage regulations. Under *Procunier* v. *Martinez, supra,* the correspondence regulation could be justified "only if it furthers an important or substantial governmental interest unrelated to the suppression of expression, and the limitation is no greater than necessary or essential to protect that interest." 777 F. 2d, at 1310. The correspondence regulation did not satisfy this standard because it was not the least restrictive means of achieving the security goals of the regulation. In the Court of Appeals' view, prison officials could meet the problem of inmate conspiracies by exercising their authority to open and read all prisoner mail. *Id.*, at 1315–1316. The Court of Appeals also concluded that the marriage rule was not the least restrictive means of achieving the asserted goals of rehabilitation and security. The goal of rehabilitation could be met through alternatives such

as counseling, and violent "love triangles" were as likely to occur without a formal marriage ceremony as with one. *Ibid.* Absent evidence that the relationship was or would become abusive, the connection between an inmate's marriage and the subsequent commission of a crime was simply too tenuous to justify denial of this constitutional right. *Id.*, at 1315.

We granted certiorari, 476 U. S. 1139 (1986).

## II

We begin, as did the courts below, with our decision in *Procunier* v. *Martinez, supra,* which described the principles that necessarily frame our analysis of prisoners' constitutional claims. The first of these principles is that federal courts must take cognizance of the valid constitutional claims of prison inmates. *Id.*, at 405. Prison walls do not form a barrier separating prison inmates from the protections of the Constitution. Hence, for example, prisoners retain the constitutional right to petition the government for the redress of grievances, *Johnson* v. *Avery,* 393 U. S. 483 (1969); they are protected against invidious racial discrimination by the Equal Protection Clause of the Fourteenth Amendment, *Lee* v. *Washington,* 390 U. S. 333 (1968); and they enjoy the protections of due process, *Wolff* v. *McDonnell,* 418 U. S. 539 (1974); *Haines* v. *Kerner,* 404 U. S. 519 (1972). Because prisoners retain these rights, "[w]hen a prison regulation or practice offends a fundamental constitutional guarantee, federal courts will discharge their duty to protect constitutional rights." *Procunier* v. *Martinez,* 416 U. S., at 405–406.

A second principle identified in *Martinez,* however, is the recognition that "courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform." *Id.*, at 405. As the *Martinez* Court acknowledged, "the problems of prisons in America are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree." *Id.*, at 404–405. Running a prison

is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. Prison administration is, moreover, a task that has been committed to the responsibility of those branches, and separation of powers concerns counsel a policy of judicial restraint. Where a state penal system is involved, federal courts have, as we indicated in *Martinez*, additional reason to accord deference to the appropriate prison authorities. See *id.*, at 405.

Our task, then, as we stated in *Martinez*, is to formulate a standard of review for prisoners' constitutional claims that is responsive both to the "policy of judicial restraint regarding prisoner complaints and [to] the need to protect constitutional rights." *Id.*, at 406. As the Court of Appeals acknowledged, *Martinez* did not itself resolve the question that it framed. *Martinez* involved mail censorship regulations proscribing statements that "unduly complain," "magnify grievances," or express "inflammatory political, racial, religious or other views." *Id.*, at 415. In that case, the Court determined that the proper standard of review for prison restrictions on correspondence between prisoners and members of the general public could be decided without resolving the "broad questions of 'prisoners' rights.'" *Id.*, at 408. The *Martinez* Court based its ruling striking down the content-based regulation on the First Amendment rights of those who are not prisoners, stating that "[w]hatever the status of a prisoner's claim to uncensored correspondence with an outsider, it is plain that the latter's interest is grounded in the First Amendment's guarantee of freedom of speech." *Id.*, at 408. Our holding therefore turned on the fact that the challenged regulation caused a "consequential restriction on the First and Fourteenth Amendment rights of those who are *not* prisoners." *Id.*, at 409 (emphasis added). We expressly reserved the question of the proper standard of

review to apply in cases "involving questions of 'prisoners' rights.'" *Ibid.*

In four cases following *Martinez*, this Court has addressed such "questions of 'prisoners' rights.'" The first of these, *Pell* v. *Procunier*, 417 U. S. 817 (1974), decided the same Term as *Martinez*, involved a constitutional challenge to a prison regulation prohibiting face-to-face media interviews with individual inmates. The Court rejected the inmates' First Amendment challenge to the ban on media interviews, noting that judgments regarding prison security "are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters." 417 U. S., at 827.

The next case to consider a claim of prisoners' rights was *Jones* v. *North Carolina Prisoners' Union*, 433 U. S. 119 (1977). There the Court considered prison regulations that prohibited meetings of a "prisoners' labor union," inmate solicitation of other inmates to join the union, and bulk mailings concerning the union from outside sources. Noting that the lower court in *Jones* had "got[ten] off on the wrong foot . . . by not giving appropriate deference to the decisions of prison administrators and appropriate recognition to the peculiar and restrictive circumstances of penal confinement," *id.*, at 125, the Court determined that the First and Fourteenth Amendment rights of prisoners were "barely implicated" by the prohibition on bulk mailings, see *id.*, at 130, and that the regulation was "reasonable" under the circumstances. The prisoners' constitutional challenge to the union meeting and solicitation restrictions was also rejected, because "[t]he ban on inmate solicitation and group meetings . . . was rationally related to the reasonable, indeed to the central, objectives of prison administration." *Id.*, at 129.

*Bell* v. *Wolfish*, 441 U. S. 520 (1979), concerned a First Amendment challenge to a Bureau of Prisons rule restricting inmates' receipt of hardback books unless mailed directly from publishers, book clubs, or bookstores. The rule was upheld as a "rational response" to a clear security problem. *Id.*, at 550. Because there was "no evidence" that officials had exaggerated their response to the security problem, the Court held that "the considered judgment of these experts must control in the absence of prohibitions far more sweeping than those involved here." *Id.*, at 551. And in *Block* v. *Rutherford*, 468 U. S. 576 (1984), a ban on contact visits was upheld on the ground that "responsible, experienced administrators have determined, in their sound discretion, that such visits will jeopardize the security of the facility," and the regulation was "reasonably related" to these security concerns. *Id.*, at 589, 586.

In none of these four "prisoners' rights" cases did the Court apply a standard of heightened scrutiny, but instead inquired whether a prison regulation that burdens fundamental rights is "reasonably related" to legitimate penological objectives, or whether it represents an "exaggerated response" to those concerns. The Court of Appeals in this case nevertheless concluded that *Martinez* provided the closest analogy for determining the appropriate standard of review for resolving respondents' constitutional complaints. The Court of Appeals distinguished this Court's decisions in *Pell*, *Jones*, *Bell*, and *Block* as variously involving "time, place, or manner" regulations, or regulations that restrict "presumptively dangerous" inmate activities. See 777 F. 2d, at 1310–1312. The Court of Appeals acknowledged that *Martinez* had expressly reserved the question of the appropriate standard of review based on inmates' constitutional claims, but it nonetheless believed that the *Martinez* standard was the proper one to apply to respondents' constitutional claims.

We disagree with the Court of Appeals that the reasoning in our cases subsequent to *Martinez* can be so narrowly

cabined.  In *Pell*, for example, it was found "relevant" to the reasonableness of a restriction on face-to-face visits between prisoners and news reporters that prisoners had other means of communicating with members of the general public.  See 417 U. S., at 823–824.  These alternative means of communication did not, however, make the prison regulation a "time, place, or manner" restriction in any ordinary sense of the term.  As *Pell* acknowledged, the alternative methods of personal communication still available to prisoners would have been "unimpressive" if offered to justify a restriction on personal communication among members of the general public.  *Id.*, at 825.  Nevertheless, they were relevant in determining the scope of the burden placed by the regulation on inmates' First Amendment rights.  *Pell* thus simply teaches that it is appropriate to consider the extent of this burden when "we [are] called upon to balance First Amendment rights against [legitimate] governmental interests."  *Id.*, at 824.

Nor, in our view, can the reasonableness standard adopted in *Jones* and *Bell* be construed as applying only to "presumptively dangerous" inmate activities.  To begin with, the Court of Appeals did not indicate how it would identify such "presumptively dangerous" conduct, other than to conclude that the group meetings in *Jones*, and the receipt of hardback books in *Bell*, both fall into that category.  See 777 F. 2d, at 1311–1312.  The Court of Appeals found that correspondence between inmates did not come within this grouping because the court did "not think a letter presents the same sort of 'obvious security problem' as does a hardback book."  *Id.*, at 1312.  It is not readily apparent, however, why hardback books, which can be scanned for contraband by electronic devices and fluoroscopes, see *Bell* v. *Wolfish, supra,* at 574 (MARSHALL, J., dissenting), are qualitatively different in this respect from inmate correspondence, which can be written in codes not readily subject to detection; or why coordinated inmate activity within the same prison is categorically different

from inmate activity coordinated by mail among different prison institutions. The determination that an activity is "presumptively dangerous" appears simply to be a conclusion about the reasonableness of the prison restriction in light of the articulated security concerns. It therefore provides a tenuous basis for creating a hierarchy of standards of review.

If *Pell, Jones,* and *Bell* have not already resolved the question posed in *Martinez,* we resolve it now: when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests. In our view, such a standard is necessary if "prison administrators . . . , and not the courts, [are] to make the difficult judgments concerning institutional operations." *Jones* v. *North Carolina Prisoners' Union,* 433 U. S., at 128. Subjecting the day-to-day judgments of prison officials to an inflexible strict scrutiny analysis would seriously hamper their ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration. The rule would also distort the decisionmaking process, for every administrative judgment would be subject to the possibility that some court somewhere would conclude that it had a less restrictive way of solving the problem at hand. Courts inevitably would become the primary arbiters of what constitutes the best solution to every administrative problem, thereby "unnecessarily perpetuat[ing] the involvement of the federal courts in affairs of prison administration." *Procunier* v. *Martinez,* 416 U. S., at 407.

As our opinions in *Pell, Bell,* and *Jones* show, several factors are relevant in determining the reasonableness of the regulation at issue. First, there must be a "valid, rational connection" between the prison regulation and the legitimate governmental interest put forward to justify it. *Block* v. *Rutherford, supra,* at 586. Thus, a regulation cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy

arbitrary or irrational. Moreover, the governmental objective must be a legitimate and neutral one. We have found it important to inquire whether prison regulations restricting inmates' First Amendment rights operated in a neutral fashion, without regard to the content of the expression. See *Pell* v. *Procunier*, 417 U. S., at 828; *Bell* v. *Wolfish*, 441 U. S., at 551.

A second factor relevant in determining the reasonableness of a prison restriction, as *Pell* shows, is whether there are alternative means of exercising the right that remain open to prison inmates. Where "other avenues" remain available for the exercise of the asserted right, see *Jones* v. *North Carolina Prisoners' Union, supra,* at 131, courts should be particularly conscious of the "measure of judicial deference owed to corrections officials . . . in gauging the validity of the regulation." *Pell* v. *Procunier, supra,* at 827.

A third consideration is the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally. In the necessarily closed environment of the correctional institution, few changes will have no ramifications on the liberty of others or on the use of the prison's limited resources for preserving institutional order. When accommodation of an asserted right will have a significant "ripple effect" on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials. Cf. *Jones* v. *North Carolina Prisoners' Union, supra,* at 132–133.

Finally, the absence of ready alternatives is evidence of the reasonableness of a prison regulation. See *Block* v. *Rutherford*, 468 U. S., at 587. By the same token, the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an "exaggerated response" to prison concerns. This is not a "least restrictive alternative" test: prison officials do not have to set up and then shoot down every conceivable alternative method of accommodat-

ing the claimant's constitutional complaint. See *ibid.* But if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard.

## III

Applying our analysis to the Missouri rule barring inmate-to-inmate correspondence, we conclude that the record clearly demonstrates that the regulation was reasonably related to legitimate security interests. We find that the marriage restriction, however, does not satisfy the reasonable relationship standard, but rather constitutes an exaggerated response to petitioners' rehabilitation and security concerns.

### A

According to the testimony at trial, the Missouri correspondence provision was promulgated primarily for security reasons. Prison officials testified that mail between institutions can be used to communicate escape plans and to arrange assaults and other violent acts. 2 Tr. 76; 4 *id.*, at 225–228. Witnesses stated that the Missouri Division of Corrections had a growing problem with prison gangs, and that restricting communications among gang members, both by transferring gang members to different institutions and by restricting their correspondence, was an important element in combating this problem. 2 *id.*, at 75–77; 3 *id.*, at 266–267; 4 *id.*, at 226. Officials also testified that the use of Renz as a facility to provide protective custody for certain inmates could be compromised by permitting correspondence between inmates at Renz and inmates at other correctional institutions. 3 *id.*, at 264–265.

The prohibition on correspondence between institutions is logically connected to these legitimate security concerns. Undoubtedly, communication with other felons is a potential spur to criminal behavior: this sort of contact frequently is

prohibited even after an inmate has been released on parole. See, *e. g.*, 28 CFR § 2.40(a)(10) (1986) (federal parole conditioned on nonassociation with known criminals, unless permission is granted by the parole officer). In Missouri prisons, the danger of such coordinated criminal activity is exacerbated by the presence of prison gangs. The Missouri policy of separating and isolating gang members — a strategy that has been frequently used to control gang activity, see G. Camp & C. Camp, U. S. Dept. of Justice, Prison Gangs: Their Extent, Nature and Impact on Prisons 64–65 (1985) — logically is furthered by the restriction on prisoner-to-prisoner correspondence. Moreover, the correspondence regulation does not deprive prisoners of all means of expression. Rather, it bars communication only with a limited class of other people with whom prison officials have particular cause to be concerned — inmates at other institutions within the Missouri prison system.

We also think that the Court of Appeals' analysis overlooks the impact of respondents' asserted right on other inmates and prison personnel. Prison officials have stated that in their expert opinion, correspondence between prison institutions facilitates the development of informal organizations that threaten the core functions of prison administration, maintaining safety and internal security. As a result, the correspondence rights asserted by respondents, like the organizational activities at issue in *Jones* v. *North Carolina Prisoners' Union*, 433 U. S. 119 (1977), can be exercised only at the cost of significantly less liberty and safety for everyone else, guards and other prisoners alike. Indeed, the potential "ripple effect" is even broader here than in *Jones*, because exercise of the right affects the inmates and staff of more than one institution. Where exercise of a right requires this kind of tradeoff, we think that the choice made by corrections officials — which is, after all, a judgment "peculiarly within [their] province and professional expertise," *Pell* v. *Pro-*

*cunier*, 417 U. S., at 827—should not be lightly set aside by the courts.

Finally, there are no obvious, easy alternatives to the policy adopted by petitioners. Other well-run prison systems, including the Federal Bureau of Prisons, have concluded that substantially similar restrictions on inmate correspondence were necessary to protect institutional order and security. See, *e. g.*, 28 CFR § 540.17 (1986). As petitioners have shown, the only alternative proffered by the claimant prisoners, the monitoring of inmate correspondence, clearly would impose more than a *de minimis* cost on the pursuit of legitimate corrections goals. Prison officials testified that it would be impossible to read every piece of inmate-to-inmate correspondence, 3 Tr. 159, 4 *id.*, at 42–43, and consequently there would be an appreciable risk of missing dangerous messages. In any event, prisoners could easily write in jargon or codes to prevent detection of their real messages. See Camp & Camp, *supra*, at 130 (noting "frequent" use of coded correspondence by gang members in federal prison); see also Brief for State of Texas as *Amicus Curiae* 7–9. The risk of missing dangerous communications, taken together with the sheer burden on staff resources required to conduct item-by-item censorship, see 3 Tr. 176, supports the judgment of prison officials that this alternative is not an adequate alternative to restricting correspondence.

The prohibition on correspondence is reasonably related to valid corrections goals. The rule is content neutral, it logically advances the goals of institutional security and safety identified by Missouri prison officials, and it is not an exaggerated response to those objectives. On that basis, we conclude that the regulation does not unconstitutionally abridge the First Amendment rights of prison inmates.*

---

*Suggesting that there is little difference between the "unnecessarily sweeping" standard applied by the District Court in reaching its judgment and the reasonableness standard described in Part II, see *post*, at 105, JUSTICE STEVENS complains that we have "ignore[d] the findings of fact that

## B

In support of the marriage regulation, petitioners first suggest that the rule does not deprive prisoners of a constitu-

were made by the District Court," *post*, at 102, n. 2, and have improperly "encroach[ed] into the factfinding domain of the District Court." *Post*, at 101.

The District Court's inquiry as to whether the regulations were "needlessly broad" is not just semantically different from the standard we have articulated in Part II: it is the least restrictive alternative test of *Procunier* v. *Martinez*, 416 U. S. 396 (1974). As *Martinez* states, in a passage quoted by the District Court:

"[T]he limitation of First Amendment freedoms must be no greater than is necessary or essential to the protection of the particular governmental interest involved. Thus a restriction on inmate correspondence . . . will . . . be invalid *if its sweep is unnecessarily broad.*" *Id.*, at 413–414 (emphasis added).

The District Court's judgment that the correspondence regulation was "unnecessarily sweeping," 586 F. Supp. 589, 596 (WD Mo. 1984), thus was a judgment based on application of an erroneous legal standard. The District Court's findings of fact 7 and 13 likewise are predicated on application of the least restrictive means standard. Finding 7 is that the correspondence rule was applied without a letter-by-letter determination of harm, and without a showing that "there is no less restrictive alternative" available; finding 13 reiterates that the correspondence rule operated as a complete ban. See *id.*, at 591–592. These findings are important only if petitioners have to show that the correspondence regulation satisfies a least restrictive alternative test: they are largely beside the point where the inquiry is simply whether the regulation is reasonably related to a legitimate governmental interest.

JUSTICE STEVENS' charge of appellate factfinding likewise suffers from the flawed premise that Part III–A answers the question JUSTICE STEVENS would pose, namely, whether the correspondence regulation satisfies strict scrutiny. Thus, our conclusion that there is a *logical* connection between security concerns identified by petitioners and a ban on inmate-to-inmate correspondence, see *supra*, at 91–92, becomes, in JUSTICE STEVENS' hands, a searching examination of the record to determine whether there was sufficient proof that inmate correspondence had actually led to an escape plot, uprising, or gang violence at Renz. See *post*, at 106–109. Likewise, our conclusion that monitoring inmate correspondence "clearly would impose more than a *de minimis* cost on the pursuit of legitimate corrections goals," *supra*, at 93, is described as a factual "finding" that it

tionally protected right. They concede that the decision to marry is a fundamental right under *Zablocki* v. *Redhail*, 434 U. S. 374 (1978), and *Loving* v. *Virginia*, 388 U. S. 1 (1967), but they imply that a different rule should obtain "in . . . a prison forum." See Brief for Petitioners 38, n. 6. Petitioners then argue that even if the regulation burdens inmates' constitutional rights, the restriction should be tested under a reasonableness standard. They urge that the restriction is reasonably related to legitimate security and rehabilitation concerns.

We disagree with petitioners that *Zablocki* does not apply to prison inmates. It is settled that a prison inmate "retains those [constitutional] rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell* v. *Procunier, supra,* at 822. The right to marry, like many other rights, is subject to substantial restrictions as a result of incarceration. Many important attributes of marriage remain, however, after taking into account the limitations imposed by prison life. First, inmate marriages, like others, are expressions of emotional support and public commitment. These elements

---

would be "an insurmountable task" to read all correspondence sent to or received by the inmates at Renz. *Post,* at 110, 112. Nowhere, of course, do we make such a "finding," nor is it necessary to do so unless one is applying a least restrictive means test.

Finally, JUSTICE STEVENS complains that Renz' ban on inmate correspondence cannot be reasonably related to legitimate corrections goals because it is more restrictive than the rule at other Missouri institutions. As our previous decisions make clear, however, the Constitution "does not mandate a 'lowest common denominator' security standard, whereby a practice permitted at one penal institution must be permitted at all institutions." *Bell* v. *Wolfish,* 441 U. S. 520, 554 (1979). Renz raises different security concerns from other Missouri institutions, both because it houses medium and maximum security prisoners in a facility without walls or guard towers, and because it is used to house inmates in protective custody. Moreover, the Renz rule is consistent with the practice of other well-run institutions, including institutions in the federal system. See Brief for United States as *Amicus Curiae* 22–24.

are an important and significant aspect of the marital relationship.  In addition, many religions recognize marriage as having spiritual significance; for some inmates and their spouses, therefore, the commitment of marriage may be an exercise of religious faith as well as an expression of personal dedication.  Third, most inmates eventually will be released by parole or commutation, and therefore most inmate marriages are formed in the expectation that they ultimately will be fully consummated.  Finally, marital status often is a precondition to the receipt of government benefits (*e. g.*, Social Security benefits), property rights (*e. g.*, tenancy by the entirety, inheritance rights), and other, less tangible benefits (*e. g.*, legitimation of children born out of wedlock).  These incidents of marriage, like the religious and personal aspects of the marriage commitment, are unaffected by the fact of confinement or the pursuit of legitimate corrections goals.

Taken together, we conclude that these remaining elements are sufficient to form a constitutionally protected marital relationship in the prison context.  Our decision in *Butler* v. *Wilson*, 415 U. S. 953 (1974), summarily affirming *Johnson* v. *Rockefeller*, 365 F. Supp. 377 (SDNY 1973), is not to the contrary.  That case involved a prohibition on marriage only for inmates sentenced to life imprisonment; and, importantly, denial of the right was part of the punishment for crime.  See *id.*, at 381–382 (Lasker, J., concurring in part and dissenting in part) (asserted governmental interest of punishing crime sufficiently important to justify deprivation of right); see generally *Mandel* v. *Bradley*, 432 U. S. 173, 176 (1977) ("Because a summary affirmance is an affirmance of the judgment only, the rationale of the affirmance may not be gleaned solely from the opinion below").

The Missouri marriage regulation prohibits inmates from marrying unless the prison superintendent has approved the marriage after finding that there are compelling reasons for doing so.  As noted previously, generally only pregnancy or birth of a child is considered a "compelling reason" to approve

a marriage. In determining whether this regulation impermissibly burdens the right to marry, we note initially that the regulation prohibits marriages between inmates and civilians, as well as marriages between inmates. See Brief for Petitioners 40. Although not urged by respondents, this implication of the interests of nonprisoners may support application of the *Martinez* standard, because the regulation may entail a "consequential restriction on the [constitutional] rights of those who are not prisoners." See *Procunier* v. *Martinez*, 416 U. S., at 409. We need not reach this question, however, because even under the reasonable relationship test, the marriage regulation does not withstand scrutiny.

Petitioners have identified both security and rehabilitation concerns in support of the marriage prohibition. The security concern emphasized by petitioners is that "love triangles" might lead to violent confrontations between inmates. See Brief for Petitioners 13, 36, 39. With respect to rehabilitation, prison officials testified that female prisoners often were subject to abuse at home or were overly dependent on male figures, and that this dependence or abuse was connected to the crimes they had committed. 3 Tr. 154–155. The superintendent at Renz, petitioner William Turner, testified that in his view, these women prisoners needed to concentrate on developing skills of self-reliance, 1 *id.*, at 80–81, and that the prohibition on marriage furthered this rehabilitative goal. Petitioners emphasize that the prohibition on marriage should be understood in light of Superintendent Turner's experience with several ill-advised marriage requests from female inmates. Brief for Petitioners 32–34.

We conclude that on this record, the Missouri prison regulation, as written, is not reasonably related to these penological interests. No doubt legitimate security concerns may require placing reasonable restrictions upon an inmate's right to marry, and may justify requiring approval of the superintendent. The Missouri regulation, however, represents an

exaggerated response to such security objectives. There are obvious, easy alternatives to the Missouri regulation that accommodate the right to marry while imposing a *de minimis* burden on the pursuit of security objectives. See, *e. g.*, 28 CFR § 551.10 (1986) (marriage by inmates in federal prison generally permitted, but not if warden finds that it presents a threat to security or order of institution, or to public safety). We are aware of no place in the record where prison officials testified that such ready alternatives would not fully satisfy their security concerns. Moreover, with respect to the security concern emphasized in petitioners' brief—the creation of "love triangles"—petitioners have pointed to nothing in the record suggesting that the marriage regulation was viewed as preventing such entanglements. Common sense likewise suggests that there is no logical connection between the marriage restriction and the formation of love triangles: surely in prisons housing both male and female prisoners, inmate rivalries are as likely to develop without a formal marriage ceremony as with one. Finally, this is not an instance where the "ripple effect" on the security of fellow inmates and prison staff justifies a broad restriction on inmates' rights—indeed, where the inmate wishes to marry a civilian, the decision to marry (apart from the logistics of the wedding ceremony) is a completely private one.

Nor, on this record, is the marriage restriction reasonably related to the articulated rehabilitation goal. First, in requiring refusal of permission absent a finding of a compelling reason to allow the marriage, the rule sweeps much more broadly than can be explained by petitioners' penological objectives. Missouri prison officials testified that generally they had experienced no problem with the marriage of male inmates, see, *e. g.*, 2 Tr. 21–22, and the District Court found that such marriages had routinely been allowed as a matter of practice at Missouri correctional institutions prior to adoption of the rule, 586 F. Supp., at 592. The proffered justification thus does not explain the adoption of a rule banning

marriages by these inmates. Nor does it account for the prohibition on inmate marriages to civilians. Missouri prison officials testified that generally they had no objection to inmate-civilian marriages, see, *e. g.*, 4 Tr. 240–241, and Superintendent Turner testified that he usually did not object to the marriage of either male or female prisoners to civilians, 2 *id.*, at 141–142. The rehabilitation concern appears from the record to have been centered almost exclusively on female inmates marrying other inmates or ex-felons; it does not account for the ban on inmate-civilian marriages.

Moreover, although not necessary to the disposition of this case, we note that on this record the rehabilitative objective asserted to support the regulation itself is suspect. Of the several female inmates whose marriage requests were discussed by prison officials at trial, only one was refused on the basis of fostering excessive dependency. The District Court found that the Missouri prison system operated on the basis of excessive paternalism in that the proposed marriages of *all* female inmates were scrutinized carefully even before adoption of the current regulation—only one was approved at Renz in the period from 1979–1983—whereas the marriages of male inmates during the same period were routinely approved. That kind of lopsided rehabilitation concern cannot provide a justification for the broad Missouri marriage rule.

It is undisputed that Missouri prison officials may regulate the time and circumstances under which the marriage ceremony itself takes place. See Brief for Respondents 5. On this record, however, the almost complete ban on the decision to marry is not reasonably related to legitimate penological objectives. We conclude, therefore, that the Missouri marriage regulation is facially invalid.

IV

We uphold the facial validity of the correspondence regulation, but we conclude that the marriage rule is constitution-

ally infirm. We read petitioners' additional challenge to the District Court's findings of fact to be a claim that the District Court erred in holding that the correspondence regulation had been applied by prison officials in an arbitrary and capricious manner. Because the Court of Appeals did not address this question, we remand the issue to the Court of Appeals for its consideration.

Accordingly, the judgment of the Court of Appeals striking down the Missouri marriage regulation is affirmed; its judgment invalidating the correspondence rule is reversed; and the case is remanded to the Court of Appeals for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE STEVENS, with whom JUSTICE BRENNAN, JUSTICE MARSHALL, and JUSTICE BLACKMUN join, concurring in part and dissenting in part.

How a court describes its standard of review when a prison regulation infringes fundamental constitutional rights often has far less consequence for the inmates than the actual showing that the court demands of the State in order to uphold the regulation. This case provides a prime example.

There would not appear to be much difference between the question whether a prison regulation that burdens fundamental rights in the quest for security is "needlessly broad"— the standard applied by the District Court and the Court of Appeals—and this Court's requirement that the regulation must be "reasonably related to legitimate penological interests," *ante*, at 89, and may not represent "an 'exaggerated response' to those concerns." *Ante*, at 87. But if the standard can be satisfied by nothing more than a *"logical* connection" between the regulation and any legitimate penological concern perceived by a cautious warden, see *ante*, at 94, n. (emphasis in original), it is virtually meaningless. Application of the standard would seem to permit disregard for inmates' constitutional rights whenever the imagination of the

warden produces a plausible security concern and a deferential trial court is able to discern a logical connection between that concern and the challenged regulation. Indeed, there is a logical connection between prison discipline and the use of bullwhips on prisoners; and security is logically furthered by a total ban on inmate communication, not only with other inmates but also with outsiders who conceivably might be interested in arranging an attack within the prison or an escape from it. Thus, I dissent from Part II of the Court's opinion.[1]

I am able to join Part III–B because the Court's invalidation of the marriage regulation does not rely on a rejection of a standard of review more stringent than the one announced in Part II. See *ante*, at 97. The Court in Part III–B concludes after careful examination that, even applying a "reasonableness" standard, the marriage regulation must fail because the justifications asserted on its behalf lack record support. Part III–A, however, is not only based on an application of the Court's newly minted standard, see *ante*, at 89, but also represents the product of a plainly improper appellate encroachment into the factfinding domain of the District Court. See *Icicle Seafoods, Inc.* v. *Worthington*, 475 U. S. 709, 714 (1986). Indeed, a fundamental difference between the Court of Appeals and this Court in this case—and the principal point of this dissent—rests in the respective ways the two courts have examined and made use of the trial record. In my opinion the Court of Appeals correctly held that the trial court's findings of fact adequately supported its judgment sustaining the inmates' challenge to the mail

---

[1] The Court's rather open-ended "reasonableness" standard makes it much too easy to uphold restrictions on prisoners' First Amendment rights on the basis of administrative concerns and speculation about possible security risks rather than on the basis of evidence that the restrictions are needed to further an important governmental interest. Judge Kaufman's opinion in *Abdul Wali* v. *Coughlin*, 754 F. 2d 1015, 1033 (CA2 1985), makes a more careful attempt to strike a fair balance between legitimate penological concerns and the well-settled proposition that inmates do not give up all constitutional rights by virtue of incarceration.

regulation as it has been administered at the Renz Correctional Center in Cedar City, Missouri. In contrast, this Court sifts the trial testimony on its own[2] in order to uphold a general prohibition against correspondence between unrelated inmates.

I

This is not a case in which it is particularly helpful to begin by determining the "proper" standard of review, as if the result of that preliminary activity would somehow lighten the Court's duty to decide this case. The precise issue before us is evident from respondents' complaint, which makes clear that they were not launching an exclusively facial attack against the correspondence regulation. Respondents instead leveled their primary challenge against the application of this regulation to mail addressed to or sent by inmates at Renz:

> "20. On information and belief, correspondence between non-family members at different institutions within the Missouri Division of Correction system is permitted at all institutions with the exception of Renz. On information and belief, defendant Turner and other employees of the Missouri Division of Corrections have a pattern and practice of refusing to permit inmates of Renz to correspond with or receive letters from inmates at other correctional institutions, a situation which appears to be unique within the Missouri Division of Corrections.

> "21. On information and belief, the reason given for refusing such correspondence is that Superintendent Turner feels that correspondence between inmates is not

---

[2] The Court cites portions of the trial transcript and the *amicus curiae* brief filed by the State of Texas, *ante*, at 91, 93, but completely ignores the findings of fact that were made by the District Court and that bind appellate courts unless clearly erroneous. Fed. Rule Civ. Proc. 52(a). The Court does not and could not deem these particular findings clearly erroneous.

in the best interest of any inmate. In this manner defendant Turner has violated the constitutional right of every inmate residing at Renz and any inmate who desires to correspond with an inmate residing at Renz." Amended Complaint, App. 11–12.

On their face, the regulations generally applicable to the Missouri Correctional System permit correspondence between unrelated inmates "if the classification/treatment team of each inmate deems it in the best interests of the parties involved."[3] After a bench trial, however, the District Court found that there was a total ban on such correspondence at Renz:

"6. The provisions of the divisional correspondence regulation allowing the classification/treatment team of each inmate to prohibit inmate-to-inmate correspondence have not been followed at Renz. Theoretically the classification/treatment team uses psychological reports, conduct violations, and progress reports in deciding whether to permit correspondence. At Renz, however, the rule as practiced is that inmates may not write non-family inmates or receive mail from non-family inmates. The more restrictive practice is set forth in the Renz Inmate Orientation Booklet presented to each inmate upon arrival at Renz. The restrictive rule at Renz is commonly known throughout the Missouri Correctional System.

"7. The Renz rule against inmate-to-inmate correspondence is enforced without a determination that the security or order of Renz or the rehabilitation of the inmate would be harmed by allowing the particular correspondence to proceed and without a determination that there is no less restrictive alternative to resolve any legitimate concerns of the Department of Corrections short of prohibiting all correspondence.

---

[3] 586 F. Supp. 589, 591 (WD Mo. 1984).

"8. Inmates at most institutions in the Missouri Correctional System are permitted to correspond with inmates in most other institutions. The greatest restriction on inmate correspondence is practiced at Renz." 586 F. Supp. 589, 591 (WD Mo. 1984).

"13. Correspondence between inmates has been denied despite evidence that the correspondence was desired simply to maintain wholesome friendships." *Id.,* at 591–592.

These factual findings, which bear out respondents' complaint, served as the basis for the District Court's injunction:

"Even if some restriction on inmate-to-inmate correspondence can be justified, the regulations and practices at bar must fall. The prohibitions are unnecessarily sweeping. Correspondence is a sufficiently protected right that it cannot be cut off simply because the recipient is in another prison, and the inmates cannot demonstrate special cause for the correspondence. . . .

. . . . .

"Defendants have failed to demonstrate that the needs of Renz are sufficiently different to justify greater censorship than is applied by other well-run institutions." *Id.,* at 596.

After reviewing the District Court's findings and conclusions, the Court of Appeals held:

"[W]ithout strong evidence that the relationship in question is or will be abusive, the connection between permitting the desired correspondence or marriage and the subsequent commission of a crime caused thereby is *simply too tenuous* to justify denial of those constitutionally protected rights. As to the security concerns, we think the prison officials' authority to open and read all prisoner mail is sufficient to meet the problem of illegal conspiracies." 777 F. 2d 1307, 1315–1316 (CA8 1985) (emphasis added).

The Court of Appeals' affirmance of the District Court thus ultimately rests upon a conclusion with which I fully agree: absent a showing that prison officials would be unable to anticipate and avoid any security problems associated with the inmate-to-inmate mail that would result from application of the correspondence rule as it is written and as enforced at other Missouri prisons, the total ban at Renz found by the District Court offends the First Amendment.

The ostensible breadth of the Court of Appeals' opinion[4] furnishes no license for this Court to reverse with another unnecessarily broad holding. Moreover, even under the Court's newly minted standard, the findings of the District Court that were upheld by the Court of Appeals clearly dictate affirmance of the judgment below.

## II

Without explicitly disagreeing with any of the District Court's findings of fact, this Court rejects the trial judge's conclusion that the total ban on correspondence between inmates at Renz and unrelated inmates in other correctional facilities was "unnecessarily sweeping" or, to use the language the Court seems to prefer, was an "exaggerated response" to the security problems predicted by petitioner's expert witnesses. Instead, the Court bases its holding upon its own highly selective use of factual evidence.

The reasons the Court advances in support of its conclusion include: (1) speculation about possible "gang problems," escapes, and secret codes, *ante*, at 91–93; (2) the fact that the correspondence regulation "does not deprive prisoners of all means of expression," *ante*, at 92; and (3) testimony indicat-

---

[4] The Court of Appeals may have used unnecessarily sweeping language in its opinion:

"We conclude that the exchange of inmate-to-inmate mail is not presumptively dangerous nor inherently inconsistent with legitimate penological objectives. We therefore affirm the district court's application of the *Martinez* strict scrutiny standard and its decision finding the Renz correspondence rule unconstitutional." 777 F. 2d, at 1313.

ing "that it would be impossible to read every piece of inmate-to-inmate correspondence," *ante*, at 93. None of these reasons has a sufficient basis in the record to support the Court's holding on the mail regulation.

Speculation about the possible adverse consequences of allowing inmates in different institutions to correspond with one another is found in the testimony of three witnesses: William Turner, the Superintendent of Renz Correctional Center; Sally Halford, the Director of the Kansas Correctional Institution at Lansing; and David Blackwell, the former Director of the Division of Adult Institutions of the Missouri Department of Corrections.

Superintendent Turner was unable to offer proof that prohibiting inmate-to-inmate correspondence prevented the formation or dissemination of escape plots. He merely asserted that the mail regulation assisted him in his duties to maintain security at Renz "[f]rom the standpoint that we don't have escapes, we don't have the problems that are experienced in other institutions." 2 Tr. 75. Nor did the Superintendent's testimony establish that permitting such correspondence would create a security risk; he could only surmise that the mail policy would inhibit communications between institutions in the early stages of an uprising. *Id.*, at 76. The Superintendent's testimony is entirely consistent with the District Court's conclusion that the correspondence regulation was an exaggerated response to the potential gang problem at Renz.[5]

---

[5] Superintendent Turner had not experienced any problem with gang warfare at Renz. 2 Tr. 117. He had not found any correspondence between gang members coming into Renz. *Id.*, at 118. He also conceded that it would be possible to screen out correspondence that posed the danger of leading to gang warfare:

"Q: Is there any reason that you could not read correspondence from other institutions to determine if these people were writing about gang warfare or something like that?

"A: I think from the standpoint of the dictates of the department and, of course, the dictates of the court, I could if there was a problem. From the

Neither of the outside witnesses had any special knowledge of conditions at Renz. Ms. Halford had reviewed the prison's rules and regulations relevant to this case, had discussed the case with Superintendent Turner, and had visited Renz for "a couple of hours." 3 *id.*, at 146. Mr. Blackwell was charged with the overall management of Missouri's adult correctional facilities and did not make daily decisions concerning the inmate correspondence permitted at Renz. *Id.*, at 259–260. He was "not sure" if he was specifically familiar with the policy at Renz that an inmate is allowed to correspond with inmates of other institutions only if they are members of the inmate's immediate family. 4 *id.*, at 44.

Neither of them, and indeed, no other witness, even mentioned the possibility of the use of secret codes by inmates. The Kansas witness testified that Kansas followed a policy of "open correspondence. . . . An inmate can write to whomever they please." 3 *id.*, at 158. She identified two problems that might result from that policy. First, in the preceding year a male inmate had escaped from a minimum security area and helped a female inmate to escape and remain at large for over a week. The witness speculated that they must have used the mails to plan their escape. The trial judge discounted this testimony because there was no proof that this or any other escape had been discussed in correspondence. *Id.*, at 158–159. Second, the Kansas witness suggested that a ban on inmate correspondence would frustrate the development of a "gang problem." *Id.*, at 160. In view of her acknowledgment that no gang problem had developed in Kansas despite its open correspondence rule, *id.*, at

standpoint of dealing with these people individually or personally, no. It would be a problem." *Ibid.*

"Q: Now, let's limit it to people who you suspect might be involved in gang warfare, for example. Do you have any reason to say it would be impossible to read all the mail of those particular people?

"A: Those that we know of that have been identified, no, it wouldn't be impossible." *Id.*, at 119.

158, the trial judge presumably also attached little weight to this prediction.   Indeed, there is a certain irony in the fact that the Kansas expert witness was unable to persuade her superiors in Kansas to prohibit inmate-to-inmate correspondence, *id.*, at 168, yet this Court apparently finds no reason to discount her speculative testimony.[6]

The Missouri witness, Mr. Blackwell, also testified that one method of trying to discourage the organization of "gangs" of prisoners with ethnic or religious similarities is "by restricting correspondence."   *Id.*, at 267.   He did not testify, however, that a total ban on inmate-to-inmate correspondence was an appropriate response to the potential gang problem.   Indeed, he stated that the State's policy did not include a "carte blanche" denial of such correspondence,[7] and he did not even know that Renz was enforcing such a total ban.[8]   His assertion that an open correspon-

---

[6] There is a further irony.   While Missouri ostensibly does not have sufficient resources to permit and screen inmate-to-inmate mail, Kansas apparently lacks sufficient resources to ban it.   Ms. Halford testified that open correspondence was not abrogated in the Kansas correctional system despite security concerns because her superiors felt that it was "too much of an effort to restrict it, that it tied up staff to send out all forms to the various and sundry institutions.   So I think we're all basically in agreement that even though it is a problem to have open correspondence, the reason that we don't do it is simply staff time."   3 *id.*, at 168.

[7] "Q. Those inmates who are allowed to write, you do not find it necessary to stop their correspondence as a matter of course; isn't that true?

"A. No, we don't stop it as a matter of course and we don't authorize it as a matter of course.   There is no carte blanche approval or denial at any facility.   It is done on a case by case individual basis and would have to be.

"Q. Let me refer specifically to inmate-to-inmate.   Are you saying there is no carte blanche denial of inmate-to-inmate or the inmates aren't told that at Renz Correctional Center?

"A. The Division policy is not carte blanche [to] deny inmate-to-inmate, or to approve it."   4 *id.*, at 43.

[8] "Q. You do know that is the rule at Renz that they cannot write to other institutions unless the inmate is a relative?

"A. I am not certain that that is the rule, no.

dence policy would pose security problems was backed only
by speculation:

> "[A]: . . . I am sure that there are some inmates at
> Renz who would write other inmates at other facilities in
> an illegitimate fashion. I also feel certain that there is
> more of a probability that they would be writing about
> things other than just sound positive letter writing,
> given the nature of the offenders at Renz.
>
> "Q: What percentage of the [mail] inmate-to-inmate
> from Renz Correctional Center have you personally read?
>
> "A: Very, very little.
>
> "Q: So you are basically speculating about what in-
> mates might write about?
>
> "A: Yes." 4 *id.*, at 82–83.

Quite clearly, Mr. Blackwell's estimate of the problems jus-
tifying some restrictions on inmate-to-inmate correspondence
provides no support for the Renz policy that he did not even
know about and that did not conform to the more liberal pol-
icy applicable to other institutions in which more serious of-
fenders are incarcerated.[9] As the District Court concluded,
petitioners "failed to demonstrate that the needs of Renz are
sufficiently different to justify greater censorship than is ap-
plied by other well-run institutions." 586 F. Supp., at 596.

---

"Q. Let me hand you Plaintiffs' Exhibit B, excuse me, Defendants' Ex-
hibit B. I don't have the plaintiffs' number. This is in evidence. It is
the inmate orientation manual, February 1983. I direct your attention to
the paragraph that says correspondence with inmates of other institutions
is permitted with immediate family members only.

"Now, were you familiar with that being the policy at Renz Correctional
Center?

"A. I am not sure if I was specifically or not." *Id.*, at 44.

[9] At the time of trial, the Renz Correctional Center contained both male
and female prisoners of varying security level classifications. Most of the
female inmates were medium and maximum security offenders, while most
of the male inmates were minimum security offenders. 777 F. 2d 1307,
1308 (CA8 1985).

The Court also relies on the fact that the inmates at Renz were not totally deprived of the opportunity to communicate with the outside world. This observation is simply irrelevant to the question whether the restrictions that were enforced were unnecessarily broad. Moreover, an evenhanded acceptance of this sort of argument would require upholding the Renz marriage regulation—which the Court quite properly invalidates—because that regulation also could have been even more restrictive.

The Court's final reason for concluding that the Renz prohibition on inmate-to-inmate correspondence is reasonable is its belief that it would be "impossible" to read all such correspondence sent or received by the inmates at Renz. No such finding of impossibility was made by the District Court, nor would it be supported by any of the findings that it did make. The record tells us nothing about the total volume of inmate mail sent or received at Renz; much less does it indicate how many letters are sent to, or received from, inmates at other institutions. As the State itself observed at oral argument about the volume of correspondence:

> "The difficulty with our position in the case is, since we had never permitted [mail between inmates], we didn't have an idea except to say that—you know, except that we had 8,000 inmates, and we figured that they would write." Tr. of Oral Arg. 14.

The testimony the Court does cite to support its conclusion that reviewing inmate-to-inmate mail would be an insurmountable task was provided by Mr. Blackwell and Ms. Halford. Mr. Blackwell testified that "[t]here is no way we can read all the mail nor would we want to . . . it is impossible." 4 Tr. 41–43.[10] Ms. Halford gave similar testi-

---

[10] "Q. The question was do you realize the plaintiffs in this case accept the rights of the Division of Corrections to read all their mail if the Division wants to?

"A. There is no way we can read all the mail nor would we want to." 4 Tr. 41.

mony,[11] but again she was referring to "all incoming mail," not to inmate-to-inmate correspondence and, of course, her testimony related to Kansas, not to the relatively small facility at Renz.[12]   In short, the evidence in the record is plainly

---

"Q.  Let me hand you Exhibit No. 3, sir, the mail and visiting rule for the Department of Corrections, specifically concerning inmate mail signed by you.

"I direct your attention to paragraph 1(C), outgoing letters will not be sealed by the inmate.   And further down in the paragraph, all letters may be inspected in the mail room and examined for contraband, escape plots, forgery, fraud, and other schemes.

"Now, tell me, sir, how do you examine a letter for an escape plot without reading it?

"A.  We do not read mail.   This does not say mail will be read.   The only time we read a letter is when we have reason to believe, for example, that an escape is being planned.   [W]hen a letter is being planned, there is no way we want to or know to read all inmate mail.   It is impossible." *Id.*, at 42–43.

There was no record indication of the amount of correspondence between inmates that would occur if it were permitted.   Mr. Blackwell stated only that in his opinion, "if we do allow inmates to write other inmates pretty much at will, the vast majority will be writing one another, at least one other offender in another institution.   I think it is obvious what it will do to mail room load." *Id.*, at 108.

[11] "[I]n Kansas we have, our rules and regulations allow us to read all incoming mail.   Due to the volume of mail that is absolutely impossible to do."   3 *id.*, at 159.

[12] The average population at Renz in the 1983 fiscal year was 270.   See American Correctional Assn., Juvenile and Adult Correctional Departments, Institutions, Agencies, and Paroling Authorities 214 (1984).

When Ms. Halford was asked why the prison officials did not read all of the inmate mail, she gave this response:

"A.  To begin with it's very boring reading.   Another thing, I think it's a poor use of staff time.   If I get more staff in, I would like to have them doing something more important than reading inmate mail.   That seems to me to be kind of a waste of time."   Tr. 176.

Earl Englebrecht testified that at Renz he scanned the contents of all approved incoming mail from other institutions, and that this task and scanning some outgoing mail together took approximately one hour a day.   5 *id.*, at 97, 99.   He could not indicate with any certainty the additional screening burden that more frequent inmate-to-inmate correspondence

insufficient to support the Court's *de novo* finding of impossibility.[13]  It does, however, adequately support this finding by the District Court that the Court ignores:

> "14. The staff at Renz has been able to scan and control outgoing and incoming mail, including inmate-to-inmate correspondence."   586 F. Supp., at 592.

Because the record contradicts the conclusion that the administrative burden of screening all inmate-to-inmate mail would be unbearable, an outright ban is intolerable.   The blanket prohibition enforced at Renz is not only an "excessive response" to any legitimate security concern; it is inconsistent with a consensus of expert opinion—including Kansas correctional authorities—that is far more reliable than the speculation to which this Court accords deference.[14]

## III

The contrasts between the Court's acceptance of the challenge to the marriage regulation as overbroad and its rejection of the challenge to the correspondence rule are striking

would impose on him and on the mail room.  *Id.*, at 102.   The testimony of these two witnesses is hardly consistent with the Court's assumption that it would be "impossible" to read the portion of the correspondence that is addressed to, or received from, inmates in other institutions.

[13] The Court's speculation, *ante*, at 88, 93, about the ability of prisoners to use codes is based on a suggestion in an *amicus curiae* brief, see Brief for State of Texas as *Amicus Curiae* 7–9, and is totally unsupported by record evidence.

[14] See ABA Standards for Criminal Justice 23–6.1, Commentary, p. 23•76 (2d ed. 1980) ("[P]risoners can write at any length they choose, using any language they desire, to correspondents of their selection, including present or former prisoners, with no more controls than those which govern the public at large").   The American Correctional Association has set forth the "current standards deemed appropriate by detention facility managers and recognized organizations representing corrections."   ACA, Standards for Adult Local Detention Facilities xiii (2d ed. 1981).   Standard 2–5328 requires clear and convincing evidence to justify "limitations for reasons of public safety or facility order and security" on the volume, "length, language, content or source" of mail which an inmate may send or receive.  *Id.*, at 88.

and puzzling.[15]  The Court inexplicably expresses different views about the security concerns common to prison marriages and prison mail.  In the marriage context expert speculation about the security problems associated with "love triangles" is summarily rejected, while in the mail context speculation about the potential "gang problem" and the possible use of codes by prisoners receives virtually total deference.  Moreover, while the Court correctly dismisses as a defense to the marriage rule the speculation that the inmate's spouse, once released from incarceration, would attempt to aid the inmate in escaping,[16] the Court grants virtually total credence to similar speculation about escape plans concealed in letters.

In addition, the Court disregards the same considerations it relies on to invalidate the marriage regulation when it turns to the mail regulation.  The marriage rule is said to sweep too broadly because it is more restrictive than the routine practices at other Missouri correctional institutions, but the mail rule at Renz is not an "exaggerated response" even though it is more restrictive than practices in the remainder of the State.  The Court finds the rehabilitative value of marriage apparent, but dismisses the value of corresponding with a friend who is also an inmate for the reason that communication with the outside world is not totally prohibited. The Court relies on the District Court's finding that the marriage regulation operated on the basis of "excessive paternal-

---

[15] The Court's bifurcated treatment of the mail and marriage regulations leads to the absurd result that an inmate at Renz may marry another inmate, but may not carry on the courtship leading to the marriage by corresponding with him or her beforehand because he or she would not then be an "immediate family member."

[16] Explaining why the request of inmate Diana Finley to be married to inmate William Quillam was denied, Superintendent Turner stated: "If he gets out, then we have got some security problems. . . . The threat, if a man gets out of the penitentiary and he is married to her and he wants his wife with him, there is very little that we can do to stop an escape from that institution because we don't have the security, sophisticated security, like a maximum security institution."  1 Tr. 185–186.  See also *id.*, at 187.

ism" toward female inmates, *ante*, at 99, but rejects the same court's factual findings on the correspondence regulation. Unfathomably, while rejecting the Superintendent's concerns about love triangles as an insufficient and invalid basis for the marriage regulation, the Court apparently accepts the same concerns as a valid basis for the mail regulation.[17]

---

[17] One of Superintendent Turner's articulated reasons for preventing one female inmate from corresponding with a male inmate closely tracks the "love triangle" rationale advanced for the marriage regulation:

"Q: Let's take Ms. Flowers. Do you know of any reason why she should not be allowed to write to Mr. Barks?

"A: Yes.

"Q: Why?

"A: She has two other men. One she wants to get married to, another man that she was involved with at Renz resides with Mr. Barks.

"Q: Let me ask you this. You have mentioned on two or three occasions that people want to get married to one man or the other. Is it your understanding that the only possible relationship between a woman and a man is one of intending to get married?

"A: Well, when they speak of love and want to marry two people, I think that one of them is going to be cut short." *Id.*, at 237–238.

The Superintendent later elaborated on redirect examination:

"Q: Now you have given an example of a problem that in your opinion justifies restrictions on correspondence as being, say, two men who were corresponding with a particular woman. Would it also be possible to call the two men in and have a chat with them in your office and try to resolve that between them?

"A: I don't see where that is necessary in my position." 2 *id.*, at 116–117.

The paternalistic enforcement of the correspondence rule to "protect" female inmates prevents them from exchanging letters with more than one male inmate. Assuming a woman has received permission to correspond with a man:

"Q: Now, what if the female inmate finds somebody new in the institution, and that person gets [pa]roled, can she then write to the new fellow?

"A: Then we have two situations then.

"Q: And, therefore, she cannot?

"A: I would say that would be a positive [triggering security concerns] situation. It wouldn't be a wholesome situation, no." *Id.*, at 134–135.

"Q: And suppose she comes to you and says, I don't want to write this old fellow anymore, I want to write to the new fellow. Is she then allowed to write to the new fellow?

In pointing out these inconsistencies, I do not suggest that the Court's treatment of the marriage regulation is flawed; as I stated, I concur fully in that part of its opinion.   I do suggest that consistent application of the Court's reasoning necessarily leads to a finding that the mail regulation applied at Renz is unconstitutional.[18]

## IV

To the extent that this Court affirms the judgment of the Court of Appeals, I concur in its opinion.   I respectfully dissent from the Court's partial reversal of that judgment on the basis of its own selective forays into the record.   When all

"A: Then we still have a problem.

"Q: Once an inmate makes a decision to write to—once a female inmate makes a decision to write to another male inmate, then she can't write to anybody?

"A: You keep saying females.   We have the same situation with the male, too, that could exist."   *Id.*, at 135.

David Blackwell testified along the same lines:

"If, for example, a male offender was believed to be in love with a female offender and another male offender wants to cause him some difficulty, he can start a rumor or confront the man with her seeing someone else or *corresponding with someone else;* and it's caused a variety of security problems by way of love triangles and situations such as that."   3 *id.*, at 271 (emphasis added).

Donald Wyrick, Director of Adult Institutions, Missouri Department of Corrections, similarly testified on the security considerations raised by women writing men at other prisons:

"Well, many times love affairs develop, then the inmate inside . . . becomes extremely worried about the female inmate, he thinks she is messing around with somebody else, all those kind of things.   He becomes agitated, worried, and frustrated, this type thing.   In my professional opinion, that could cause him to do bad things.   It might even cause him to explode and hurt someone or attempt to escape."   4 *id.*, at 231–232.

[18] Having found a constitutional violation, the District Court has broad discretion in fashioning an appropriate remedy.   Cf. *United States* v. *Paradise*, 480 U. S. 149, 155–156, n. 4 (1987) (STEVENS, J., concurring in judgment).   The difficulties that a correspondence policy is likely to impose on prison officials screening inmate-to-inmate mail bear on the shaping of an appropriate remedy.   It is improper, however, to rely on speculation about these difficulties to obliterate effective judicial review of state actions that abridge a prisoner's constitutional right to send and receive mail.

the language about deference and security is set to one side, the Court's erratic use of the record to affirm the Court of Appeals only partially may rest on an unarticulated assumption that the marital state is fundamentally different from the exchange of mail in the satisfaction, solace, and support it affords to a confined inmate. Even if such a difference is recognized in literature, history, or anthropology, the text of the Constitution more clearly protects the right to communicate than the right to marry. In this case, both of these rights should receive constitutional recognition and protection.