Calvin JOHNSON et al., Plaintiffs,

v.

Nelson A. ROCKEFELLER, Governor, State of New York, et al., Defendants.

No. 72 Civ. 1699.

United States District Court, S. D. New York.

Argued March 8, 1973.

Decided Oct. 9, 1973.

Herman Schwartz, Buffalo, N. Y., (Norman Rosenberg, Edward Koren, New York Civil Liberties Union, Buffalo, N. Y., Melvin Wulf, American Civil Liberties Union, New York City, on the brief), for plaintiffs.

Maria L. Marcus, Asst. Atty. Gen. (Samuel A. Hirshowitz, First Asst. Atty. Gen., Louis J. Lefkowitz, Atty. Gen., of the State of New York, Albany, N.Y., on the brief), for defendants.

Before HAYS, Circuit Judge, and BRYAN and LASKER, District Judges.

HAYS, Circuit Judge:

This class action challenged the constitutionality of New York Civil Rights Law §§ 79 and 79–a (McKinney's Consol.

---

Laws, c. 6, Supp. 1972) as they stood on the date of argument, March 8, 1973.[1]

I. When this case was argued §§ 79 and 79–a of the New York Civil Rights Law read as follows:

### § 79. Forfeiture of office and suspension of civil rights

A sentence of imprisonment in a state prison for any term less than for life or a sentence of imprisonment in a state prison for an indeterminate term, having a minimum of one day and a maximum of natural life, forfeits all the public offices, and suspends, during the term of the sentence, all the civil rights, and all private trusts, authority, or powers of, or held by, the person sentenced; but nothing herein contained shall be deemed to suspend the right or capacity of any of the following persons to institute an action or proceeding in a court or before a body or officer exercising judicial, quasi-judicial or administrative functions, with respect to matters other than those arising out of his arrest or detention:

a. A person sentenced to state prison for any term less than for life or a person sentenced to imprisonment in a state prison for an indeterminate term, having a minimum of one day and a maximum of his natural life, on whom sentence was imposed and the execution of the judgment suspended, while the execution of the judgment remains suspended;

b. A person sentenced to state prison for any term less than for life or a person sentenced to imprisonment in a state prison for an indeterminate term, having a minimum of one day and a maximum of his natural life, while he is released on parole, or after he has been discharged from parole.

### § 79–a. Consequence of sentence to imprisonment for life

1. A person sentenced to imprisonment for life is thereafter deemed civilly dead; provided, that such a person may marry while on parole, or after he has been discharged from parole, if otherwise capable of contracting a valid marriage. Such capability shall be deemed to exist where the marriage of a person sentenced to imprisonment for life has been terminated by divorce, annulment, or subsequent remarriage of a former spouse. A marriage contracted pursuant to this section by a person while he is on parole, without prior written approval of the board of parole, shall be ground for revocation of the parole.

2. This section shall not apply to a person sentenced to imprisonment for an indeterminate term, having a minimum of one day and a maximum of his natural life.

3. Nothing in this section shall be deemed to suspend the right or capacity of a person sentenced to imprisonment for life, while he is released on parole, or after he has been discharged from parole, to institute an action or proceeding in a court or before a body or officer exercising judicial, quasi-judicial, or administrative functions, with respect to matters other than those arising out of his arrest and detention.

4. Nothing in this section shall be deemed to preclude the issuance of a certificate of good conduct by the board of parole pursuant to the executive law to a person who previously has been sentenced to imprisonment for life.

Those sections as amended and effective as of September 10, 1973, now read:

### § 79. Forfeiture of office and suspension of civil rights

1. Except as provided in subdivision two a sentence of imprisonment in a state correctional institution for any term less than for life or a sentence of imprisonment in a state correctional institution for an indeterminate term, having a minimum of one day and a maximum of natural life, forfeits all the public offices, and suspends, during the term of the sentence, all the civil rights, and all private trusts, authority, or powers of, or held by, the person sentenced.

2. A sentence of imprisonment in a state correctional institution for any term less than for life or a sentence of imprisonment in a state correctional institution for an indeterminate term, having a minimum of one day and a maximum of natural life shall not be deemed to suspend the right or capacity of any person so sentenced to commence and prosecute an action or proceeding in any court within this state or before a body or officer exercising judicial, quasi-judicial or administrative functions within this state; provided, however, that where at the time of the commencement and during the prosecution of such action or proceeding such person is an inmate of a state correctional institution, he shall not appear at any place other than within the institution for any purpose related to such action or proceeding unless upon a subpoena issued by the court before whom such action or proceeding is pending or, where such action or proceeding is pending before a body or officer, before a judge to whom a petition for habeas corpus could be made under subdivision (b) of section seven thousand two of the civil practice law and rules upon motion of any party and upon a determination that such person's appearance is essential to the proper and just disposition of the action or proceeding. Unless

---

The plaintiffs sought injunctive and declaratory relief against the enforcement

the court orders otherwise, a motion for such subpoena shall be made on at least two days' notice to the commissioner of correctional services.

3. (a) Except as provided in paragraph (b), the state shall not be liable for any expense of or related to any such action or proceeding, including but not limited to the expense of or related to transporting the inmate to, or lodging or guarding him at any place other than in a state correctional institution. The Department of Correctional Services shall not be required to perform any services related to such action or proceeding, including but not limited to transporting the inmate to or lodging or guarding him at any place other than a state correctional institution unless and until the Department has received payment for such services.

(b) Where the inmate is permitted in accordance with any other law to proceed with the action or proceeding as a poor person the expense of transporting the inmate to, or lodging or guarding him at any place other than in a state correctional institution or any other expense relating thereto shall be a state charge; provided, however, that where an inmate has been granted such permission and a recovery by judgment or by settlement is had in his favor, the court may direct him to pay out of the recovery all or part of any sum expended by the state.

**§ 79–a. Consequence of sentence to imprisonment for life**

1. Except as provided in subdivisions two and three, a person sentenced to imprisonment for life is thereafter deemed civilly dead; provided, that such a person may marry while on parole, or after he has been discharged from parole, if otherwise capable of contracting a valid marriage. Such capability shall be deemed to exist where the marriage of a person sentenced to imprisonment for life has been terminated by divorce, annulment, or subsequent remarriage of a former spouse. A marriage contracted pursuant to this section by a person while he is on parole, without prior written approval of the board of parole, shall be ground for revocation of the parole.

2. A sentence to imprisonment for life shall not be deemed to suspend the right or capacity of any person so sentenced to commence, prosecute or defend an action or proceeding in any court within this state or before a body or officer exercising judicial, quasi-judicial or administrative functions within this state; provided, however, that where at the time

of the commencement and during the prosecution or defense of such action or proceeding such person is an inmate of a state correctional institution, he shall not appear at any place other than within the institution for any purpose related to such action or proceeding unless upon a subpoena issued by the court before whom such action or proceeding is pending or, where such action or proceeding is pending before a body or officer, before a judge to whom a petition for habeas corpus could be made under subdivision (b) of section seven thousand two of the civil practice law and rules upon motion of any party and upon a determination that such person's appearance is essential to the proper and just disposition of the action or proceeding. Unless the court orders otherwise, a motion for such subpoena shall be made on at least two days' notice to the commissioner of correctional services.

3. (a) Except as provided in paragraph (b), the state shall not be liable for any expense of or related to any such action or proceeding, including but not limited to the expense of or related to transporting the inmate to, or lodging or guarding him at any place other than in a state correctional institution. The Department of Correctional Services shall not be required to perform any services related to such action or proceeding, including but not limited to transporting the inmate to or lodging or guarding him at any place other than a state correctional institution unless and until the Department has received payment for such services.

(b) Where the inmate is permitted in accordance with any other law to proceed with the action or proceeding as a poor person the expense of transporting the inmate to, or lodging or guarding him at any place other than in a state correctional institution or any other expense relating thereto shall be a state charge; provided, however, that where an inmate has been granted such permission and a recovery by judgment or by settlement is had in his favor, the court may direct him to pay out of the recovery all or part of any sum expended by the state.

4. This section shall not apply to a person sentenced to imprisonment for an indeterminate term, having a minimum of one day and a maximum of his natural life.

Nothing in this section shall be deemed to preclude the issuance of a certificate of good conduct by the board of parole pursuant to law to a person who previously has been sentenced to imprisonment for life.

of those statutes insofar as they deprived convicted and incarcerated felons of (1) access to the state courts to sue for money damage claims and (2) the right to marry. The named plaintiffs in this suit are all inmates in the Green Haven Correctional Facility in New York State and are serving terms up to and including life imprisonment. All of the plaintiffs except for Butler have claims for either personal injuries or property damage which they were prohibited from prosecuting in the state courts by §§ 79 and 79-a of the New York "civil death" provisions before the recent amendments. Plaintiff Butler, who is serving a life term, has been denied the right to marry—another aspect of "civil death"—based upon § 79-a of the state Civil Rights Law.

The New York statutes at issue herein were challenged as being violative of the Fifth, Eighth, Ninth and Fourteenth Amendments as well as 42 U.S.C. § 1983. Jurisdiction was based on 28 U.S.C. § 1343.

The convening judge, D.C., 58 F.R.D. 42, dismissed the complaint against the State of New York and against Louis Lefkowitz, the Attorney General of the State of New York. He also determined that the class action requirements of Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure had been met.

We hold that the action brought on behalf of plaintiffs seeking access to the courts to sue for money damages has been made moot by the recent passage of amendments to §§ 79 and 79-a of the New York Civil Rights Law. See footnote 1. The amendments do not affect the claims of plaintiff Butler and the class he represents. We therefore dismiss as moot the action of all of the plaintiffs except Butler and we proceed to consider whether the ban on marriage applied to prisoners serving life sentences in state prisons in New York under § 79-a is violative of the Constitution of the United States.

Plaintiff Butler who is serving a life term in the New York State prison system complains that he is denied the right to marry by the civil death provisions of New York State Civil Rights Law § 79-a.

In actuality the effect of the statute is to deny to Butler only the right to go through the formal ceremony of marriage. Those aspects of marriage which make it "one of the 'basic civil rights of man,'" Loving v. Virginia, 388 U.S. 1, 12, 87 S.Ct. 1817, 1824, 18 L.Ed.2d 1010 (1967)—cohabitation, sexual intercourse, and the begetting and raising of children—are unavailable to those in Butler's situation because of the fact of their incarceration. The statute adds nothing of significance to the effects of such incarceration.

■■ We can perceive no merit in plaintiffs' claim of denial of equal protection and due process. Insofar as the deprivation of the right to participate in the ceremony of marriage can be considered as imposing punishment in addition to incarceration it is a penalty which is well within New York's power to prescribe. A state has considerable freedom within the limits of the Eighth Amendment in determining what form punishment for crime shall take. Deprivation of physical liberty is not the sole permissible consequence of a criminal conviction. See Green v. Board of Elections, 380 F.2d 445 (2d Cir. 1967), cert. denied, 389 U.S. 1048, 88 S.Ct. 768, 19 L.Ed.2d 840 (1968) (upholding statute denying convicted felon the right to vote); Fincher v. Scott, 411 U.S. 961, 93 S.Ct. 2151, 36 L.Ed.2d 681 (1973), aff'g mem., 352 F.Supp. 117 (M.D.N.C. 1972) (3-judge court) (same); Beacham v. Braterman, 396 U.S. 12, 90 S. Ct. 153, 24 L.Ed.2d 11 (1969), aff'g mem., 300 F.Supp. 182 (S.D.Fla.1969) (3-judge court) (same).

■ Plaintiffs argue that the penological goal of rehabilitation is not served by prohibiting marriage. But it is not for us, whatever our personal views, to choose among the various possible penological goals or to pass upon the wisdom of penal legislation aimed at deterrence or even retribution.

■ The state can also rely on its general power over the institution of marriage to justify its ban on the marriage of life-term prisoners. As the Supreme Court has said:

"[The legislature] prescribes the age at which parties may contract to marry, the procedure or form essential to constitute marriage, the duties and obligations it creates, its effects upon the property rights of both, present and prospective, and the acts which may constitute grounds for its dissolution."

Maynard v. Hill, 125 U.S. 190, 205, 8 S.Ct. 723, 726, 31 L.Ed. 654 (1888).[2]

The state's interest in marriage surely extends to the power to deny the right to marry to prisoners incarcerated for life who cannot be expected to perform the duties and obligations imposed on a husband by the state's laws relating to marriage, such as, the duty to support wife and children, N.Y. Family Court Act §§ 412, 413 (McKinney Supp. 1972).

■ Plaintiff Butler makes a claim under the Ninth Amendment asserting that the prohibition against marriage is violative of his constitutional right of privacy. However, we need not determine the nature of that right or the application to it of the Ninth Amendment because we are here dealing with a situation where the basis of the challenge to state power is the mere formal ceremony of marriage. That ceremony has none of the elements of marital privacy which bring the marriage relationship under constitutional protection. See Griswold v. Connecticut, 381 U.S. 479, 486, 85 S. Ct. 1678, 14 L.Ed.2d 510 (1965).

■ Although there has been no definitive interpretation of what constitutes "cruel and unusual" punishment, we are of the opinion that neither under the decisions of the Supreme Court, nor of this circuit, have the plaintiffs shown that the New York civil death provisions violate the Eighth Amendment. The prohibition against participating in the marriage ceremony does not subject a life-term prisoner to a "fate forbidden by the principle of civilized treatment guaranteed by the Eighth Amendment," Trop v. Dulles, 356 U.S. 86, 99, 78 S.Ct. 590, 597, 2 L.Ed.2d 630 (1958), nor is it "barbarous" or "shocking to the conscience," Sostre v. McGinnis, 442 F.2d 178, 191 (2d Cir. 1971) (en banc),[3] cert. denied, 404 U.S. 1049, 92 S.Ct. 719, 30 L.Ed.2d 740; 405 U.S. 978, 92 S.Ct. 1190, 31 L.Ed.2d 254 (1972).

The complaint is dismissed.

LASKER, District Judge (concurring in part and dissenting in part).

I agree with the majority that § 79–a's marriage bar may be regarded as a punishment,[1] and if so is constitutionally "within New York's power to prescribe." I therefore concur in holding the statute is constitutional.

I disagree, however, with the majority's characterization of the deprivation imposed by § 79–a, that is, that "[i]n actuality the effect of the statute is to

---

2. "Absent some specific federal constitutional or statutory provision, marriage in this country is completely under state control . . . . " Boddie v. Connecticut, 401 U.S. 371, 389, 91 S.Ct. 780, 792, 28 L.Ed.2d 113 (1971) (Black, J. dissenting).

3. We find nothing unconstitutional in the policy apparently pursued by the state's Commissioner of Correctional Services which, under certain circumstances, allows prisoners serving less than life terms to marry. Nor does this discretionary policy render the total ban (as applied to lifers) of § 79–a unconstitutional. The fact that the state has provided less severe punishment for less serious crime does not invalidate its

continued ban on marriage as an additional punishment for crimes of the most serious nature.

1. Even this point is not free from doubt. Section 79 is not part of the Penal Law, but of the Civil Rights Law. The State does not argue that it was intended as a form of punishment, and there is a serious question whether it originated historically as punishment. It seems rather that, so far as the marriage bar is concerned, the ancient view was that those who committed serious crimes ought not to be allowed to procreate. See "The Collateral Consequences of Criminal Conviction," 23 Vand.L.Rev. 927, 1065 (1970).

deny to Butler only the right to go through the formal ceremony of marriage." This formulation appears to approve the State's argument that marriage for or to a life-termer is no marriage at all, because it does not permit cohabitation and procreation. Although the tangible elements of marriage thus emphasized are undoubtedly of central importance in ordinary circumstances, nevertheless, the non-tangible devotion of man and wife is certainly of equal—many would say higher—value. By barring Butler's marriage, the state deprives him and his wife-to-be of the critical emotional support to be found in the formalized and symbolic relation itself. The State prevents them from committing themselves to each other. The importance of these interests has recently been recognized by the Commissioner of Correctional Services, who has said:

"A major Departmental objective is to foster ties to the community that will help create stability in the inmate's personal life. Accordingly, the permission of the Commissioner will no longer be required in a case where an inmate wishes to marry, and the Department will provide appropriate assistance to inmates who wish to become married." Administrative Bulletin #107, from Peter Preiser, Commissioner, to Superintendents of Correctional Facilities and Camps, dated August 13, 1973.

I disagree with the majority, therefore, that the "statute adds nothing of significance to the effects of such incarceration."

Furthermore, the formalized commitment is vital not only as an emotional support during the period of incarceration, even if it be actually for life, but also as a solemn undertaking to the panoply of the marriage relationship in the event of the prisoner's release by parole or commutation, possibilities which become actualities in a significant number of cases. It is no answer that in such an event the parties would be free to marry, for the passage of years without the existence or possibility of even a formalized emotional commitment will almost certainly mean that the wife-to-have-been will have built her life elsewhere.

I differ, too, from the majority's view that the State's power to regulate the institution of marriage justifies the ban on marriage of life-term prisoners. Without denying that power or denigrating the State's interest in preserving the integrity of marriage as an institution, I see no reasoned basis for the State's claim that that integrity depends on barring the marriage of life-term prisoners to the infinitesimally small number of women who are willing to embark on a relationship which they must necessarily understand will be of the most limited nature. No wife entering into such a marriage will expect support from her husband—unless his means permit it. Since conjugal arrangements do not exist in New York, no child will require support; and should New York law permit conjugal visits in the future, contraceptive methods and the wife's constitutional (and, in New York, statutory) right to an abortion assure that no child will be born except in accordance with the wife's deliberate wish. Furthermore there may be a strong State interest in preserving such marriages:

"No civil deprivation is likely to affect the convict more adversely than the loss of domestic rights. One recent study of post-release failures among federal prison releasees found that released convicts who resumed residence with their wives experienced the lowest recidivism rate. Ex-convicts who lived alone, however, were determined to be the most likely to return to crime. These findings dramatically illustrate the interest that society has in preserving the family ties of imprisoned convicts. Unfortunately, present laws largely ignore this interest." "The Collateral Consequences of a Criminal Conviction," 23 Vand.L.Rev. 929, 1168 (1970) (footnote omitted).

I concur with the majority that neither the decisions to date of the Supreme Court nor of this Circuit establish that the marriage bar violates the Eighth Amendment. But the argument that the deprivation of the right to marry is cruel punishment is nonetheless powerful.

First, marriage is a fundamental right in the constitutional sense: "one of the 'basic civil rights of man,'" Loving v. Virginia, 388 U.S. 1, 12, 87 S.Ct. 1817, 1824, 18 L.Ed.2d 1010 (1967).

Second, the statute here prohibits a critical formalized emotional commitment without any compelling necessity and without benefiting the state. It *gratuitously* imposes a punishment the significance of which, when added to the life term, is non-existent or at most miniscule. In that sense the punishment is "excessive" within the meaning of the Eighth Amendment.

However, the Eighth Amendment—as construed by the Supreme Court—does not appear to be triggered by excessiveness alone; rather, as stated by Mr. Justice Brennan in Furman v. Georgia, 408 U.S. 238, 282, 92 S.Ct. 2726, 2748, 33 L.Ed.2d 346 (1972):

> "The test, then, will ordinarily be a cumulative one: If a punishment is unusually severe, if there is a strong probability that it is inflicted arbitrarily, if it is substantially rejected by contemporary society, and if there is no reason to believe that it serves any penal purpose more effectively than some less severe punishment, then the continued infliction of that punishment violates the command of the Clause that the State may not inflict inhuman and uncivilized punishments upon those convicted of crimes."

Even if the marriage bar be regarded as "arbitrary" and "severe punishment," which has not been "shown to serve any penal purpose more effectively than a significantly less drastic punishment", nothing in the record nor anything of which we can take judicial notice establishes that society has indicated that it does not regard the bar as acceptable. It is true that 38 or more States permit prisoner marriages,[2] but New York has the constitutional right to tread its own path.

Perhaps the fact that the New York Legislature has this year repealed the bar to civil suits for damages by prisoners and that the Commissioner of Correction has altered the State's policy so as to allow the marriage of all prisoners but life-termers is a sign in the wind that the medieval relic which is the remaining subject of this litigation will soon be discarded. Under the decisions to date of the higher courts, however, the responsibility for such a change lies with the legislature of the State.

---

**2.** "The Collateral Consequences of a Criminal Conviction," 23 Vand.L.Rev. 929, 950, n. 71 (1970). Since 1970, when only thirteen states had civil death statutes, one state (Idaho) has repealed its civil death provision, one (New Jersey) enacted a new law and the law of one (Oregon) was stricken by a three-judge district court, so that twelve states now have civil death laws on their books. No information is at hand as to whether all of these statutes bar marriage of prisoners.