**Richard LANGONE and Dari Schmall, on behalf of themselves and a class consisting of all similarly situated individuals, Plaintiffs,**

**v.**

**Thomas COUGHLIN, III, Commissioner of the Department of Correctional Services of the State of New York, and Philip Coombe, Superintendent of Eastern Correctional Facility, Defendants.**

No. 84–CV–1177.

United States District Court, N.D. New York.

May 26, 1989.

Debevoise & Plimpton, New York City, for plaintiffs; Steven Klugman, Terry E. Thornton, Arthur H. Amron, of counsel.

Robert Abrams, Atty. Gen. of the State of N.Y., Albany, N.Y., for defendants; Robert A. Siefgried, Asst. Atty. Gen., of counsel.

### MEMORANDUM–DECISION AND ORDER

McCURN, Chief Judge.

*Introduction*

On October 6, 1987, the court heard oral argument on several motions in this action. In particular, the named plaintiffs, Richard Langone and Dari Schmall, moved for class certification for all those similarly situated

pursuant to Fed.R.Civ.P. 23(b)(2). The court granted that motion. In addition, plaintiffs moved for summary judgment pursuant to Fed.R.Civ.P. 56. Defendants, Thomas Coughlin III, the Commissioner of the Department of Correctional Services of the State of New York and Philip Coombe, Superintendent of the Eastern Correctional Facility, (collectively referred to herein as "the State") cross-moved for summary judgment. The court reserved decision and the following constitutes the court's decision regarding those motions.

*Background*

The facts of this case are simple and undisputed. When this action was commenced in 1984, plaintiff Richard Langone was an inmate in the Eastern Correctional Facility in Naponoch, New York, serving a sentence of fifteen years to life for second degree murder. He is now at Queensborough Correctional Facility in New York City, where he has been participating in a work release and weekend furlough program since October of 1988. Mr. Langone continues to be under the control and custody of the New York State Department of Correctional Services ("DOCS").

While serving his life sentence, plaintiff Langone requested permission to marry a non-inmate, plaintiff Dari Schmall. Relying upon New York Civil Rights Law § 79–a ("§ 79–a") and DOCS Directive Number 4201 (9/14/79) ("directive"), DOCS denied that request.[1] Section 79–a states in relevant part:

Except as provided in subdivisions two and three[2], a person sentenced to imprisonment for life is thereafter deemed civilly dead; provided, that such a person may marry while on parole, or after he has been discharged from parole, if otherwise capable of contracting a valid marriage. A marriage contracted pursuant to this section by a person while he is on parole, without prior written approval

of the board of parole, shall be ground for revocation of the parole. This section shall not be deemed to impair the validity of a marriage between a person sentenced to imprisonment for life and his spouse.

N.Y. Civ. Rights Law § 79–a(1) (McKinney Supp.1989). The directive provides in pertinent part:

Any inmate may marry providing there are no legal impediments to the marriage. Legal impediments may fall into the following areas:

A. Sentence. Section 79–a of the New York Civil Rights Law prohibits an offender sentenced to life imprisonment from entering into a marriage until such time as the inmate is paroled.

Amron Affidavit (8/10/87), Ex. B thereto. Counsel have stipulated to the fact that the purpose of that directive is to provide notice to inmates of the statutory prohibition set forth in § 79–a. That directive merely implements the ban of § 79–a; it does not serve as any independent correctional policy.

Plaintiffs have brought this summary judgment motion claiming that § 79–a creates an impermissible legislative distinction between married and unmarried life inmates in violation of the latter's constitutional rights. Specifically, plaintiffs claim that § 79–a impermissibly distinguishes between married and unmarried life inmates in violation of the equal protection and due process clauses of the United States Constitution, in that the former's marriages remain intact, while the latter are prohibited from marrying after they begin serving their life sentences. Likewise, plaintiffs claim that the directive is an impermissible infringement upon the unmarried life inmates' fundamental right to marry. The State cross moves for summary judgment basically asserting that its interest in punishing those who commit serious crimes is

---

1. The DOCS denies all such marriage requests based upon § 79–a. *See* Defendants' Rule 10(j) Statement at par. 5.

2. Subdivisions two and three essentially recognize the right of those imprisoned for life to

commence or defend judicial and/or administrative proceedings within the state of New York. N.Y.Civ. Rights Law §§ 79–a(2) and (3) (McKinney 1976).

"sufficiently important" to justify the marriage prohibition set forth in § 79–a.

## Discussion

The primary issue presented by these motions is whether, as a matter of law, § 79–a and the directive create an impermissible legislative classification between married and unmarried inmates serving life sentences, in violation of the equal protection clause of the fourteenth amendment. Before addressing that broad issue, there are two preliminary matters for the court's consideration. The first issue is the applicability, if any, of *Johnson v. Rockfeller*, 365 F.Supp. 377 (S.D.N.Y.1973), *aff'd without opinion sub nom. Butler v. Wilson*, 415 U.S. 953, 94 S.Ct. 1479, 39 L.Ed.2d 569 (1974), *("Johnson")* to the present case. In the State's view, *Johnson* is dispositive of the motions before the court and mandates granting its cross-motion for summary judgment.

In *Johnson*, a three judge panel held that the predecessor to § 79–a did not violate plaintiffs' equal protection and due process rights.[3] In so holding the majority reasoned:

Insofar as the deprivation of the right to participate in the ceremony of marriage can be considered as imposing punishment in addition to incarceration it is a penalty which is well within New York's power to prescribe.

*Id.* at 380. *Johnson* was decided prior to 1981, however, and that is significant because in 1981 § 79–a was amended. Prior to 1981 § 79–a provided:

Except as provided in subdivisions two and three, a person sentenced to imprisonment for life is thereafter deemed civilly dead; provided, that such a person may marry while on parole, or after he has been discharged from parole, if otherwise capable of contracting a valid marriage. Such capability shall be deemed to exist where the marriage of a person sentenced to imprisonment for

life has been terminated by divorce, annulment, or subsequent remarriage of a former spouse. A marriage contracted pursuant to this section by a person while he is on parole, without prior written approval of the board of parole, shall be ground for revocation of the parole.

1981 N.Y. Laws Ch. 118. Also at that time § 6(2) of the Domestic Relations Law read:

A marriage is absolutely void if contracted by a person whose husband or wife by a former marriage is living, unless ...

2. Such former husband or wife has been finally sentenced to imprisonment for life; this exception shall not apply if the marriage with such former husband or wife was contracted pursuant to the provisions of section seventy-nine-a of the civil rights law.

When read in conjunction those statutes were confusing, as the New York Court of Appeals explained in *Ferrin v. Dep't of Correctional Services*, 71 N.Y.2d 42, 523 N.Y.S.2d 485, 517 N.E.2d 1370 (1987):

[T]he validity of an *existing lawful marriage* became voidable when one of the partners to the marriage was sentenced to life imprisonment. The confusion, however, was as to whether the voidability was effected automatically, by operation of law, because of the civil death status or only upon express election of the noninmate spouse who wished also to be free of the marriage.....

*Id.* at 46, 523 N.Y.S.2d at 487, 517 N.E.2d at 1372 (emphasis in original) (citations omitted).

To eliminate that confusion, in 1981 § 79–a was amended to add the following language:

This section shall not be deemed to impair the validity of a marriage between a person sentenced to imprisonment for life and his spouse.

N.Y.Civ. Rights Law § 79–a nt. (McKinney Supp.1989). Section 6(2) of the Domestic Relations Law was also repealed then. 1981 N.Y. Laws Ch. 118 § 2. The 1981

---

**3.** Judge Lasker concurred with the Court's holding that § 79–a was constitutional. He dissented, however, from the majority's characterization of the nature of the deprivation imposed

by § 79–a and from their view that the ban on the marriage of life-term prisoners is justified by the state's power to regulate the marriage institution. *Id.* at 381–83.

amendment of § 79–a made clear that the validity of the marriages of those sentenced to life imprisonment would not be disturbed by the imposition of a life sentence on one of the spouses to the marriage. Therefore, after the 1981 amendment, if a married person is sentenced to life imprisonment, the free spouse must take the necessary legal action if he or she wants to terminate the marital relationship. Given the differences between § 79–a as it read when *Johnson* was decided and as it now reads, this court is not compelled to follow *Johnson* in the present case.

Moreover, not only is the applicability of *Johnson* undermined by the obvious factual distinctions between it and the present case, but from a procedural standpoint *Johnson* is also of little precedential value to this court. The Supreme Court summarily affirmed *Johnson*. Unlike an affirmance on the merits, the precedential value of a summary affirmance is subject to certain limitations. One such limitation is that "a summary affirmance is an affirmance of the judgment only, the rationale of the affirmance may not be gleaned solely from the opinion below." *Mandel v. Bradley*, 432 U.S. 173, 176, 97 S.Ct. 2238, 2240, 97 S.Ct. 2238 (1977). Another limitation is that the precedential value of a summary affirmance "extends only to 'the precise issues presented and necessarily decided.'" *Metromedia, Inc. v. San Diego*, 453 U.S. 490, 499, 101 S.Ct. 2882, 2888, 69 L.Ed.2d 800 (1981) (quoting *Mandel v. Bradley*, 432 U.S. at 176, 97 S.Ct. at 2240). A third limitation is that "an unexplicated summary affirmance ... is not to be read as a renunciation by this court of doctrines previously announced in our opinions after full argument." *Mandel v. Bradley*, 432 U.S. at 176, 97 S.Ct. at 2240.

Applying those guidelines to the present case, it is clear that the State's cross-motion for summary judgment cannot be disposed of based solely upon the Supreme Court's summary affirmance of *Johnson*. First, because there is no way of knowing the Supreme Court's rationale for affirm-

ing *Johnson*, it is impossible to conclude, as the State would like this court to do, whether the Supreme Court affirmed on the basis that § 79–a serves an important state interest in the punishment of crime. Second, and of equal import, is the fact that the binding precedential value of a summary affirmance is limited to the "precise" issues presented and decided. Therefore, due to the differences in statutory language, as discussed above, the issues before the *Johnson* Court were clearly different from those presently before this court. Given the obvious factual distinctions and the procedural posture of *Johnson*, this court does not find *Johnson* to be controlling.

■ The second issue is what standard of review should the court employ in analyzing plaintiffs' equal protection challenge to § 79–a; and bound up with that determination is the nature of the right at issue. Plaintiffs claim that by not being allowed to marry they are being deprived of a fundamental right. The State asserts that because plaintiffs are incarcerated they are only being deprived of the right to participate in a formal marriage ceremony, which the State asserts does not rise to the level of a fundamental right.

In *Turner v. Safley*, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), the Supreme Court extended its earlier decisions holding that marriage is a fundamental right,[4] to conclude that there is "[a] constitutionally protected marital relationship in the prison context." *Id.* at 96, 107 S.Ct. at 2265. In so concluding, the Court reasoned that the constitutionally protected right to marriage in the prison context encompasses far more than simply the right to participate in a formal marriage ceremony. Specifically, the Supreme Court explained:

> The right to marry, like many other rights, is subject to substantial restrictions as a result of incarceration. Many important attributes of marriage remain, however, after taking into account the limitations imposed by prison life. First, inmate marriages, like others, are ex-

---

**4.** *See, Zablocki v. Redhail,* 434 U.S. 374, 98 S.Ct. 673, 54 L.Ed.2d 618 (1976); *Loving v. Virginia,* 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967).

pressions of emotional support and public commitment. These elements are an important and significant aspect of the marital relationship. In addition, many religions recognize marriage as having spiritual significance; for some inmates and their spouses, therefore, the commitment of marriage may be an exercise of religious faith as well as an expression of personal dedication. Third, most inmates eventually will be released by parole or commutation, and therefore most inmate marriages are formed in the expectation that they ultimately will be fully consummated. Finally, marital status often is a precondition to the receipt of government benefits (*e.g.*, Social Security benefits), property benefits (*e.g.*, tenancy be the entirety, inheritance rights), and other, less tangible benefits (*e.g.*, legitimation of children born out of wedlock). These incidents of marriage, like the religious and personal aspects of the marriage commitment, are unaffected by the fact of confinement or the pursuit of legitimate corrections goals.

*Id.* at 95–96, 107 S.Ct. at 2265. Based upon the foregoing, it is inconceivable to this court how the State can seriously contend that the only element of an inmate marriage is the right to participate in a marriage ceremony. Even though the *Turner* Court did not explicitly characterize the right to marry in a prison setting as "fundamental," it is clear that the Court considered it as such.

■ Having concluded that the right to marry in a prison setting is a fundamental one, the court must next consider the appropriate standard of review for § 79–a and the directive. Relying upon several Supreme Court decisions, including *Zablocki v. Redhail,* 434 U.S. 374, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978), plaintiffs contend that the State has the burden of showing (1) that § 79–a promotes a compelling state interest; (2) that § 79–a is closely tailored to effectuate only those compelling interests; and (3) that the State chosen legislative classification between unmarried and married life inmates "bears a substantial relation to the objective of the legislation." In essence, plaintiffs are asking this court to apply a strict scrutiny analysis to § 79–a, or at least a heightened level of scrutiny beyond the more lenient rational relationship test.

On the other hand, the State argues that the test set forth in *Turner* should apply. The Supreme Court in *Turner* expressly adopted a reasonable relationship test for determining the constitutionality of prison regulations. In *Turner,* the Eighth Circuit, applying a strict scrutiny standard, held that inmates' constitutional rights were violated by prison regulations pertaining to correspondence between inmates and by a regulation severely restricting the right of inmates to marry. The Supreme Court held, however, that "[a] lesser standard of scrutiny is appropriate in determining the constitutionality of ... prison rules." *Id.* 482 U.S. at 81, 107 S.Ct. at 2257. Specifically, the Court held:

[W]hen a prison regulation impinges on inmates constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests.

*Id.* at 89, 107 S.Ct. at 2261. In so holding, the Court explained that such a test was proper because of the deference which federal courts should give to the appropriate prison authorities. *Id.* at 84, 107 S.Ct. at 2259. In *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987), another prison regulation case, the Supreme Court further explained:

This approach ensures the ability of corrections officials 'to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration,' ..., and avoids unnecessary intrusion of the judiciary into problems particularly ill-suited to 'resolution by decree.'

*Id.* at 349–50, 107 S.Ct. at 2404–05 (citations omitted).

It is plaintiffs' position that the reasonable relationship test adopted by the Supreme Court in *Turner* does not apply here because, among other things, prison regulations were at issue in *Turner* and it is a statute as well as a directive which are at issue here. Plaintiffs suggest that the

statute and the directive should be subject to different standards of review. In particular, plaintiffs urge this court to apply the *Turner* standard to the directive, but not to § 79–a. The court finds no basis for making such a distinction. *Turner* seems to be advocating a policy of judicial restraint, *regardless* of whether it is a regulation or a statute which allegedly infringes upon a prisoner's constitutionally protected rights. That conclusion is supported by the *Turner* Court's observation that:

> Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the *Legislative and Executive Branches of Government.* Prison administration is, moreover, a task that has been committed to the responsibility of those branches, and separation of power concerns counsel a policy of judicial restraint.

*Id.* 482 U.S. at 84–85, 107 S.Ct. at 2259 (emphasis added). Thus, the court will examine both § 79–a and the directive based upon the test enunciated in *Turner.*[5]

As previously mentioned, the Supreme Court in *Turner*, by a 5–4 majority, held that the proper standard for assessing whether a prison regulation (and by implication a statute) violates prisoners' constitutional rights is whether the regulation bears a reasonable relationship to legitimate penological interests. The Court in *Turner* outlined four factors bearing on that reasonableness determination. Those factors are: (1) whether there is a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it; (2) whether there are alternative means of exercising the right that remain open to prison inmates; (3) the impact accommodation of the asserted constitutional right will have

on guards and other inmates, and on the allocation of prison resources generally; and (4) the absence of ready alternatives. *Id.* at 89, 107 S.Ct. at 2262.

### *I. Governmental Interests*

■ The Second Circuit recently held that with respect to the first *Turner* factor, "there was no burden on DOCS to persuade the district court that its concerns were justifiable." *Fromer v. Scully*, 874 F.2d 69, 74 (2d Cir.1989). Instead, the Second Circuit placed the burden on the plaintiff to show that those concerns were "irrational." *Id.* In the present case, the State advances three governmental interests which it claims justify the classification made in § 79–a between prisoners serving life sentences who were married prior to sentencing and those who were not married. Those interests are punishment; regulation of marriage and the corollary obligation of support; and clarification and protection of the pre-existing marital and family status of legally recognized marriages. After *Fromer*, plaintiffs herein must show that those governmental interests are irrational.[6]

### A. Punishment

It appears to the court, and the State conceded at oral argument, that punishment is the primary justification for the marriage prohibition contained in § 79–a. As plaintiffs astutely observed, however:

> [R]ather than advancing the governmental interest in additional punishment, the requirement that the inmate be unmarried at the time of sentencing actually erodes any punishment interest by allowing others who presumably warrant additional punishment (because they committed crimes punishable by life imprison-

---

**5.** Consequently, hereinafter all references to § 79–a shall also be read to include the directive.

**6.** The court notes that, especially with respect to the second and third interests articulated by the State, it has serious reservations as to whether those interests are in fact "legitimate penological objectives." In the court's opinion, those

objectives do not fall into the same category as safety, security and rehabilitation—three interests typically offered by corrections officials as justification for prison regulations. For purposes of analysis, however, the court will assume that the three governmental interests advanced by the State herein are "legitimate penological objectives."

ment) to avoid such punishment simply because they married prior to sentencing. Plaintiffs' Objections to the Magistrate's Report and Recommendation at p. 35–36. Further, assuming that punishment is the interest which the State is seeking to advance through the marriage ban, that interest is not adequately promoted because the statutory classification is underinclusive; § 79–a affects only unmarried life inmates and expressly excludes from additional punishment married prisoners serving life sentences.

Moreover, if the objective of § 79–a is indeed punishment, the court can envision a scenario under which the nature of the crime committed could be related to imposing an additional punishment.[7] It is inconceivable to this court, however, how marital status is in any way relevant to punishment. An inmate's marital status is certainly not a logical measure of either the severity of the crime or of whether the inmate deserves additional punishment. Simply put, this court can find absolutely no "valid, rational connection" between § 79–a and punishment. In *Turner* the Supreme Court explained that "[a] regulation *cannot be sustained* where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational." *Id.* 482 U.S. at 89–90, 107 S.Ct. at 2262 (emphasis added). The connection here between the marriage ban set forth in § 79–a and punishment is, in this court's opinion, "so remote" as to render that statute (and the directive) arbitrary and irrational.

**B. Regulation of Marriage and Support**

There is also no "valid, rational connection" between § 79–a and the State's claimed interest in regulating marriage and support obligations. First, as plaintiffs correctly pointed out, "under *Zablocki*, the State's interest in support obligations and the economic aspects of marriage are insufficient to justify a deprivation of all the benefits of a legal marriage." Plaintiffs'

Memorandum of Law at p. 19 (citing *Zablocki*, 434 U.S. at 388–90, 98 S.Ct. at 682–83). Second, as plaintiff's persuasively contend, even if the State's alleged interest in regulating marriage and support obligations provides adequate justification for the absolute ban set forth in § 79–a, that statute is "grossly underinclusive" for that purpose. *Id.* at p. 20. By virtue of their confinement, all of those imprisoned for life are in the exact same position insofar as their ability to provide support for themselves, their spouses and their children. Thus, if marriage and support regulation is truly the motivation behind § 79–a, those interests are clearly not being served by § 79–a.

**C. Clarification of Marital Status**

Finally, the court is unable to find any "valid, rational connection" between § 79–a and the State's articulated interest in "clarifying" the marital status of some inmates serving life sentences. Apparently the gist of the State's third claimed objective is that § 79–a as it currently reads removes uncertainty after sentencing as to the marital status of married inmates serving life sentences. Assuming for the sake of argument that § 79–a serves that purpose, as plaintiffs pointed out, it is constitutionally impermissible to "clarify" the marital status of married life inmates by discriminating against unmarried life inmates by denying them the right to marry. *See, e.g., Skinner v. Oklahoma,* 316 U.S. 535, 541, 62 S.Ct. 1110, 1113, 86 L.Ed. 1655 (1942) ("When the law lays an unequal hand on those who have committed intrinsically the same quality of offense ..., it has made as an invidious a discrimination as if it had selected a particular race or nationality for oppressive treatment.") Furthermore, as plaintiffs also accurately reasoned, "[e]ven if it were necessary to clarify the marital status of life inmates, the Equal Protection Clause requires that the marital status of all life inmates, regardless of the timing of their marriage, be similarly treated." Plaintiffs' Memorandum of Law at p. 21.

---

**7.** In fact, in *Turner* the Supreme Court acknowledged that denial of the right to marry to *all* life inmates under § 79–a's predecessor was justi-

fied as part of the punishment. *Id.* 482 U.S. at 95, 107 S.Ct. at 2265.

In light of the foregoing, plaintiffs have obviously met their burden under *Fromer* of demonstrating that the governmental interests urged by the State as justification for § 79–a are irrational.

## II. Alternative Means

Insofar as the second *Turner* factor is concerned, there simply are no alternative means available to plaintiffs which would allow them to exercise the right to marry. Section 79–a is an absolute and unequivocal ban on the marriage of prisoners serving life sentences, who were not married prior to sentencing. The Supreme Court in *Turner* explained the underlying rationale for the alternative means factor as follows:

> Where " 'other avenues' " remain available for the exercise of the asserted right, ..., courts should be particularly conscious of the " 'measure of judicial deference owed to corrections officials ... in gauging the validity of the regulation.' "

*Id.* (citations omitted). Because no "other avenues" are available to plaintiffs for exercising their constitutionally protected right to marry, the court need not be concerned, as it ordinarily would, with deference to corrections officials.

## III. Impact of Accommodation

Turning to the third factor identified in *Turner*—impact of accommodation—the Court once again expressed concern over the amount of deference to be accorded to corrections officials. Specifically, the *Turner* Court cautioned lower courts:

> In the necessarily closed environment of the correctional institution, few changes will have no ramifications on the liberty of others or on the use of the prison's limited resources for preserving institutional order. When accommodation of an asserted right will have a significant " 'ripple effect' " on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials.

*Id.* 482 U.S. at 90, 107 S.Ct. at 2262. The marriage regulation at issue in *Turner* prohibited inmates from marrying other inmates or civilians, unless the prison super-intendent determined that there were compelling reasons for such marriage. The Supreme Court held that marriage ban to be "constitutionally infirm". *Id.* at 99, 107 S.Ct. at 2267. In so doing the Court reasoned, in part:

> [T]his is not an instance where the 'ripple effect' on the security of fellow inmates and prison staff justifies a broad restriction on inmates' rights—indeed, where the inmate wishes to marry a civilian, the decision to marry (apart from the logistics of the wedding ceremony) is a completely private one.

*Id.* at 98, 107 S.Ct. at 2266. Given the substantial similarity between the *Turner* marriage regulation and § 79–a, the court finds that reasoning to be equally applicable here.

## IV. Absence of Ready Alternatives

In explaining the significance of the fourth *Turner* factor, the Court stated:

> [T]he existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns..... [I]f an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard.

*Id.* at 90–91, 107 S.Ct. at 2262. Plaintiffs in this case have not suggested to the court any alternative means which would fully accommodate their right to marry. That lack of proof is understandable, though, because this is not a situation where other *alternative* means are available to plaintiffs: they are either allowed to marry or they are not. The court is mindful of the Second Circuit's recent pronouncement in *Fromer* that the fourth *Turner* factor "requires plaintiffs ... to show that there are obvious, easy " 'alternative[s] ... [that] fully accommodate the prisoner's rights at *de minimis* cost to valid penological interests....' " *Fromer*, at 76 (quoting *Turner*, 107 S.Ct. at 2262). Insofar as that language can be read as placing an affirmative obligation on plaintiffs to come forth with proof of alternative means, the court

cannot accept that reading of *Turner*. Nowhere did the Court in *Turner* suggest that a plaintiff challenging a prison regulation must satisfy each of the four factors ennunciated therein. Rather, it appears to the court that *Turner* simply recognized that evidence of alternative means is but one of several factors for a court's consideration in determining the reasonableness of a given prison regulation.

In conclusion, for the reasons discussed herein, the court is simply unable to find a reasonable relationship between § 79–a and any legitimate penological objective. Although not a factor mentioned by the *Turner* Court, the court is compelled to mention that the position taken by the State with respect to this litigation is ironic, to say the least, in light of the fact that the DOCS' *own* policies support the right of inmates serving life sentences to marry.[8] Since approximately 1987, the DOCS has supported proposed legislation seeking to repeal the marriage prohibition imposed by § 79–a. In support of such legislation, the DOCS, as recently as January 22, 1987, has stated:

> There appears to be *no legitimate state purpose in preventing [unmarried life inmates] from marrying*. Maintaining this dichotomy may well violate the equal protection and due process clauses of the Constitution. In addition, permitting such marriages could contribute to the rehabilitation of inmates and would establish family ties which hopefully will deter the inmate from returning to a life of crime upon his release.

Amron Affidavit (8/10/87) at par. 3, and Ex. C thereto (emphasis added). Similarly, in 1985 the New York Law Revision Commission recommended to the New York State Legislature that § 79–a be repealed. In its memorandum to the 1985 Legislature, the Commission opined, "Marriage restrictions are among the more counterproductive of civil disabilities." Defendants' Ex. A. at p. A–443. The Commission further stated:

> The Commission also agrees with the conclusion of the American Bar Association Section of Criminal Justice with respect to the legal status of inmates, that there are essentially " 'two justifications for restrictions of otherwise absolute rights—institutional security and order.' " Clearly, marriage restrictions do not fall under either category.

*Id.* The Commission concluded its memorandum by recognizing that "[a]pplication of marriage restrictions only to inmates sentenced to life lacks any rational basis...." *Id.*

In sum, the court finds that § 79–a and Directive 4201 (9/14/79) cannot pass constitutional muster insofar as they prohibit inmates serving life sentences from marrying. Accordingly, it is hereby ordered that:

(1) plaintiffs' motion for summary judgment is granted;

(2) the State's cross-motion for summary judgment is denied; and

(3) defendants, their agents, successors and all others acting in concert with them are enjoined from enforcing the unconstitutional provisions of N.Y.Civ. Rights Law § 79–a.

IT IS SO ORDERED.

---

**8.** The State is apparently aware of that irony as is evidenced by its recognition that § 79–a "may be unwise, anachronistic, or even counterproductive...." *Defendants' Memorandum of Law* at p. 17.