791 A.2d 281 (2002)
348 N.J. Super. 70
Judith VAZQUEZ, Appellant,
v.
NEW JERSEY DEPARTMENT OF CORRECTIONS, Respondent.
Superior Court of New Jersey, Appellate Division.
Submitted November 27, 2001.
Decided February 14, 2002.
Judith Vazquez, appellant pro se.
John J. Farmer, Jr., Attorney General, attorney for respondent (Patrick DeAlmeida, Assistant Attorney General, of counsel; Mr. DeAlmeida and Victoria L. Kuhn, Deputy Attorney General, on the brief).
Before Judges SKILLMAN, WALLACE, Jr. and WELLS.
The opinion of the court was delivered by SKILLMAN, P.J.A.D.
This is an appeal from a prison administrator's denial of an inmate's request for permission to marry a non-inmate.
The respondent Department of Corrections has adopted regulations under which an inmate must obtain permission to get married from the administrator of the prison in which the inmate is incarcerated. N.J.A.C. 10A:17-7.1(a). The regulations require an inmate to request such permission at least ninety days before the proposed wedding date. Ibid. The regulations further provide that any request by an inmate for permission to marry shall be referred to a marriage committee, composed of a chaplain, the social work supervisor, a correctional staff officer with the rank of Lieutenant or above and such other staff as the superintendent may designate. N.J.A.C. 10A:17-7.2.
The standards for approval of a request for permission to marry are set forth in N.J.A.C. 10A:17-7.3(c), which provides:
An inmate's request to marry may be considered for approval if:
1. The inmate has made a satisfactory correctional facility adjustment;
2. The inmate's marriage would not present a risk to security or the orderly operation of the correctional facility;
3. The inmate's intended spouse is not presently incarcerated; and *282 4. The inmate is able to comply with all of the requirements of the State laws governing marriage. In addition, N.J.A.C. 10A:17-7.3(d) provides:
The committee may consider other factors such as:
1. The inmate's maturity;
2. The inmate's emotional stability;
3. The length and type of sentence;
4. The inmate's ability to make a rational, informed decision concerning entering the marriage relationship; and/or
5. Other factors deemed appropriate by the committee for consideration.
Appellant Judith Vazquez, an inmate serving a life sentence in the Edna Mahan Correctional Facility for Women, sent a letter to the administrator of that institution requesting permission to marry a non-inmate. Appellant's letter stated in part:
The man I am requesting permission to marry, his name is Brian Joseph May, he is also my age of 44. We have known each other for well over 23 years. We both understand and know the sentence I have which is 30 to life, of which I have served 8 years.
Mr. May was married before and divorced, I was also married before and am widowed ten years now. I have been made aware that there may be some counseling, but I do not know if this applies to us or not being that we both have been married before. If so, can you please let me know when and how many times and will Mr. May also have to attend.
We do wish to do everything that is necessary according to the rules and on time, so that we may have the marriage performed on the date we choose Nov. 4, 2000.
We both have faith that through my appeals I may have a chance in getting my conviction overturned.
I would be grateful if the committee would approve in us having our marriage ceremony here at the facility.
Brian May, the person appellant desires to marry, sent a similar letter to the administrator, asking her to approve the planned marriage.
Appellant's request was referred to the marriage committee, which interviewed both appellant and May, following which it sent a memorandum to the administrator recommending denial of appellant's request for permission to marry. This memorandum stated:
After interviewing both candidates the committee felt that this marriage would not be in the best interest of either party or the institution.
Judith Vasquez is currently serving a thirty-year sentence and is not eligible for parole until September 12, 2022. Both Mr. Mays and Judith appeared unrealistic as to the length of sentence and both seemed to think that Judith's sentence would eventually be lowered. Mr. Mays went as far as to imply he had knowledge of the crime but couldn't discuss it with the committee. He talked about building a log cabin in South Dakota for him and Judith to live in. They both said they have known each other for 23 years but both were very vague about the prior relationship. In addition, the relationship could not be documented.
Judith was very nervous during the interview and talked mostly about her crime and how she didn't commit the murder. Brian was very talkative but was very sarcastic towards custody's questioning. He went as far as to say "I don't really understand why we are even *283 involved that this is between him and Judith." There were several contradictions during the interviews, for example, Judith claimed that he was pushing for marriage and he stated that Judith is pushing to get married and that he was willing to wait for her to get out. Judith told the committee that Mr. Mays is ill and wanted to get married so that if anything happened to him she would be taken care of. Mr. Mays stated that this had never entered into his mind.
In conclusion, these two individuals are not good candidates for marriage. They have only been in touch the last six months and he has been visiting the last three months. We do not feel that there has been an established relationship that would warrant marriage.
The administrator accepted this recommendation and denied appellant's request to marry by a written memorandum decision, which stated:
Please be advised that I have reviewed your request to marry as well as the recommendations and findings of the Marriage Committee.
Findings of the committee noted that there were several contradictions to the statements made by both parties. Both parties stated disparate reasons for the request to marry and who initiated the idea of requesting it. Both of you were vague in terms of any relationship prior to incarceration that would substantiate a basis for the request to marry.
It is indicated that you have only been in contact the last six months and visits have only been active for the past three.
Clearly the committee's interview did not find a basis to support the request for marriage. In that this committee is charged with making a recommendation that is in the interests of both parties and the institution, it is determined that the recommendation to deny your request is appropriate.
Accordingly, the determination of the committee is sustained and your request is denied.
Appellant argues that the administrator's decision violated her constitutional right to marry and constituted an abuse of discretion. Appellant also argues that the administrative regulations pursuant to which this decision was made are unconstitutional.
In Turner v. Safley, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), the Supreme Court sustained the validity of the part of a prison marriage regulation which required inmates to obtain permission to marry from the prison superintendent. However, the Court invalidated the part of the regulation which stated that permission to marry would be given only if there were "compelling reasons," such as the birth of a child or pregnancy. Id. at 94-99, 107 S.Ct. at 2265-67, 96 L.Ed.2d at 83-85. The Court held that this part of the regulation impinged on inmates' constitutional rights and was not "reasonably related to [legitimate] penological interests." Id. at 97, 107 S.Ct. at 2266, 96 L.Ed.2d at 84. In concluding that an inmate retains a constitutionally protected right to marry, the Court stated:
The right to marry, like many other rights, is subject to substantial restrictions as a result of incarceration. Many important attributes of marriage remain, however, after taking into account the limitations imposed by prison life. First, inmate marriages, like others, are expressions of emotional support and public commitment. These elements are an important and significant aspect of the marital relationship. In addition, many religions recognize marriage as having spiritual significance; for some inmates and their spouses, therefore, the *284 commitment of marriage may be an exercise of religious faith as well as an expression of personal dedication. Third, most inmates eventually will be released by parole or commutation, and therefore most inmate marriages are formed in the expectation that they ultimately will be fully consummated. Finally, marital status often is a precondition to the receipt of government benefits ( e.g., Social Security benefits), property rights ( e.g., tenancy by the entirety, inheritance rights), and other, less tangible benefits ( e.g., legitimation of children born out of wedlock). These incidents of marriage, like the religious and personal aspects of the marriage commitment, are unaffected by the fact of confinement or the pursuit of legitimate corrections goals.
Taken together, we conclude that these remaining elements are sufficient to form a constitutionally protected marital relationship in the prison context.
[Id. at 95-96, 107 S.Ct. at 2265, 96 L.Ed.2d at 83.]
The Court recognized that "legitimate security concerns may require placing reasonable restrictions upon an inmate's right to marry," 482 U.S. at 97, 107 S.Ct. at 2266, 96 L.Ed.2d at 84, but concluded that requiring an inmate to show "compelling reasons" to marry "represent[ed] an exaggerated response to such security objectives." Id. at 97-98, 107 S.Ct. at 2266, 96 L.Ed.2d at 84.
In addition, the Court indicated that security concerns ordinarily could justify denial of a request for permission to marry only if an inmate desired to marry another inmate. Id. at 97-98, 107 S.Ct. at 2266, 96 L.Ed.2d at 84-85. In fact, the Court went so far as to say that "where the inmate wishes to marry a civilian, the decision to marry (apart from the logistics of the wedding ceremony) is a completely private one." Id. at 98, 107 S.Ct. at 2266, 96 L.Ed.2d at 85.[1] The court also cautioned that the penological interest in rehabilitation may not be invoked as a justification for "excessive paternalism" in reviewing an inmate's request for permission to marry. Id. at 99, 107 S.Ct. at 2267, 96 L.Ed.2d at 85.[2]
It is evident that even though Turner was decided fifteen years ago, the Department of Corrections' regulations relating to inmate marriages have not been reconsidered in light of the constitutional constraints recognized by the Supreme Court. For example, the Department's regulations still contain a blanket prohibition against the approval of an inmate's marriage to another inmate, N.J.A.C. 10A:17-7.3(c)(3), despite Turner's holding that such marriages cannot be totally prohibited or even limited to situations where an inmate can show "compelling reasons" for the marriage. Thus, the regulations in their present form do not reflect the governing constitutional limitations upon a correctional institution's exercise of its right to require an inmate to obtain permission to marry, *285 and must be reconsidered. However, we perceive no need to conduct a section by section review of the validity of those regulations in light of Turner in order to decide this appeal from the denial of an individual inmate's request for permission to marry.
The decisions of the marriage committee and administrator do not identify any security or rehabilitative concerns that could justify the denial of appellant's request for permission to marry. Although appellant and her intended spouse may entertain an unduly optimistic view of appellant's prospects for early release, this is common among inmates and does not provide a basis for denying appellant the right to marry. The fact that Mays may have responded sarcastically to what he considered to be overly intrusive questioning by the marriage committee does not indicate that he poses any kind of security threat to the institution. The committee's conclusion that appellant and Mays do not have "an established relationship that would warrant marriage" represents an example of the "excessive paternalism" unrelated to a prison's legitimate security and rehabilitation concerns that the Court in Turner found to violate an inmate's constitutional rights. Id. at 99, 107 S.Ct. at 2267, 96 L.Ed.2d at 85. Similarly, the administrator's view that appellant was required to show a "relationship prior to incarceration that would substantiate a basis for the request to marry" is inconsistent with the principles set forth in Turner. Therefore, the administrator's decision violated appellant's constitutional right to marry.
Accordingly, the administrator's decision is reversed, and the matter is remanded to the Department to make appropriate arrangements for appellant and Mays to be married.
NOTES
[1] The Court raised, but did not decide, the issue of whether a regulation that undertakes to restrict the right of marriage between inmates and non-inmates is subject to the "strict scrutiny" standard of constitutional review. Id. at 97, 107 S.Ct. at 2266, 96 L.Ed.2d at 84.
[2] The Court noted that in Butler v. Wilson, 415 U.S. 953, 94 S.Ct. 1479, 39 L.Ed.2d 569 (1974), it summarily affirmed the federal district court decision in Johnson v. Rockefeller, 365 F.Supp. 377 (S.D.N.Y.1973), which upheld the validity of a statute that denied the right to marry to inmates sentenced to life imprisonment. Id. at 96, 107 S.Ct. at 2265, 96 L.Ed.2d at 83. However, respondent does not rely upon Butler or argue that inmates subject to life imprisonment may be prohibited from marrying. In any event, Turner has substantially diluted whatever precedential weight Butler may have had.