2006 ND 78

**Reuben LARSON, Plaintiff and Appellant,**

v.

**Timothy SCHUETZLE, Warden, N.D. State Penitentiary, Defendant and Appellee.**

No. 20050418.

Supreme Court of North Dakota.

April 19, 2006.

Reuben Larson (submitted on brief), (*pro se*), Bismarck, ND.

Ken R. Sorenson (submitted on brief), Assistant Attorney General, Office of Attorney General, Bismarck, ND, for defendant and appellee.

VANDE WALLE, Chief Justice.

[¶ 1]  Reuben Larson sought a writ of certiorari asking the district court to declare that the penitentiary warden exceeded his jurisdiction and violated Larson's constitutional rights in the application of the prisoner disciplinary rules. The district court denied Larson's application for the writ and he appealed. We affirm.

I

[¶ 2]  Larson is a prisoner at the North Dakota State Penitentiary in Bismarck. Larson possessed, in his prison cell, some religious magazines given to him by other inmates. Larson also had a picture of an American flag, which he cut out of a newspaper, posted on his cell wall in an area designated for inmates to hang pictures.

[¶ 3]  Prison guards confiscated the religious magazines, ordered Larson to remove the American flag, and commenced disciplinary procedures against Larson. Prison officials maintained they took these actions in accordance with the rules and procedures contained in the Inmate Handbook adopted by the Department of Corrections.

[¶ 4]  Prison officials contended the religious magazines could be confiscated because they were not directly addressed to Larson and Larson received them from other inmates. Prison officials note the Inmate Handbook clearly states inmates may possess magazines only if the magazines are addressed directly to the inmates. Prison officials allege Larson was ordered to remove the American flag because it was property that was altered

from its original state by being cut from a newspaper, and therefore was considered contraband under the Inmate Handbook.

II

[¶ 5]  Section 32–33–01, N.D.C.C., provides:

A writ of certiorari shall be granted by the supreme court or district court when an officer, board, tribunal, or inferior court has exceeded the jurisdiction of such officer, board, tribunal, or inferior court, as the case may be, and there is no appeal, nor, in the judgment of the court, any other plain, speedy, and adequate remedy, and also when, in the judgment of the court, it is deemed necessary to prevent miscarriage of justice.

Section 32–33–09, N.D.C.C., provides:

Except as otherwise provided by law, the review upon a writ of certiorari cannot be extended further than to determine whether the inferior court, tribunal, board, or officer has pursued regularly the authority of such court, tribunal, board, or officer.

[¶ 6]  "We have held that the phrase 'pursued regularly the authority' contained in Section 32–33–09 is synonymous with 'jurisdiction' as that term is used in Section 32–33–01." *Manikowske v. N.D. Workmen's Comp. Bur.*, 373 N.W.2d 884, 886 (N.D.1985). Therefore, our review is limited to the question of whether the warden has exceeded his jurisdiction. *Id.* "In the context of a certiorari proceeding, we have defined 'jurisdiction' as 'the power and authority to act with respect to any particular subject matter.'" *Id.*

[¶ 7]  Our statutory law gives the warden authority and control over the peniten-

tiary and its inmates. Section 12–47–11, N.D.C.C., provides:

> The warden, under the direction of the director of the department of corrections and rehabilitation, shall have the charge, custody, and control of the penitentiary and offenders committed to the legal and physical custody of the department and placed by the department at the penitentiary, together with all lands, buildings, furniture, tools, implements, stock, provisions, and every other species of property pertaining to the penitentiary or within the premises of the penitentiary. The warden shall superintend and be responsible for the policing of the penitentiary and the discipline of the offenders placed by the department at the penitentiary.

Section 12–47–12, N.D.C.C., provides, in part:

> The warden, subject to the approval of the director of the department of corrections and rehabilitation, shall make rules not in conflict with the laws of this state and shall prescribe penalties for violation of the rules:
>
> . . . .
>
> 3. For the conduct of offenders imprisoned in the penitentiary.

[¶ 8] "[M]aintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees." *Bell v. Wolfish*, 441 U.S. 520, 546, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). " '[C]entral to all other corrections goals is the institutional consideration of internal security within the corrections facilities themselves.' " *Id.* at 546–47, 99 S.Ct. 1861. "Prison officials must be free to take appropriate action to ensure the safety of inmates and corrections personnel and to prevent escape or unauthorized entry." *Id.* at 547, 99 S.Ct.

1861. Prison administrators are entitled to deference in the adoption and execution of policies intended "to preserve internal order and discipline and to maintain institutional security." *Id.*

### III

[¶ 9] The first rule at issue is the penitentiary's "no-passing" rule. The penitentiary's "no-passing" rule provides that possession of another inmate's property is considered contraband and inmates are not permitted to possess contraband at any time. The 7th Circuit Court of Appeals has held a similar "no-passing" rule constitutional. *Ford v. Schmidt*, 577 F.2d 408, 410 (7th Cir.1978). The rule examined in *Ford* provided that no inmate may possess unauthorized property and no inmate shall pass property to anyone without authorization. *Id.* at 409. The *Ford* court held "the security of the institution would be threatened by the absence of a property transfer regulation and the 'no-passing' rule here involved was rationally related to meeting that security need." *Id.* at 410.

[¶ 10] The second rule at issue is the penitentiary's "publisher-only" rule which provides that inmates may only receive books, magazines, and periodicals if they are received directly from the publisher. The United States Supreme Court has held that a New York City correctional facility rule prohibiting the receipt of hardcover books unless mailed directly from publishers, book clubs, or bookstores is constitutional. *Bell v. Wolfish*, 441 U.S. 520, 550, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). The correctional facility argued the rule was designed to promote security and order at the facility. *Id.* at 544, 99 S.Ct. 1861. The Supreme Court agreed, stating this "limited restriction is a rational response by prison officials to an obvious security problem." *Id.* at 550, 99 S.Ct. 1861. The Court agreed that hardcover

books were especially convenient tools for smuggling contraband such as money, drugs, and weapons into a correctional facility and that these books are difficult to search effectively. *Id.* at 551, 99 S.Ct. 1861.

[¶ 11]  Since the Supreme Court's decision in *Bell*, several federal courts have upheld the constitutionality of "publisher-only" rules similar to the rules at issue here. *See Cotton v. Lockhart*, 620 F.2d 670, 672 (8th Cir.1980) (upholding constitutionality of "publisher-only" rule applying to magazines, newspapers, and books under reasoning of Supreme Court in *Bell* because rule is a reasonable and constitutional response to a legitimate and substantial concern for institutional security); *Ward v. Washtenaw Cty. Sheriff's Dept.*, 881 F.2d 325, 330 (6th Cir.1989) (extending the *Bell* decision to include magazines because the rule was reasonably related to legitimate penological interests); *Kines v. Day*, 754 F.2d 28, 31 (1st Cir.1985) (holding a "publisher-only" rule applying to hardcover, softcover, and newspaper publications did not violate the constitution on its face); *Avery v. Powell*, 806 F.Supp. 7, 11 (D.N.H.1992) (holding a "publisher-only" rule was constitutional because prison administrators are accorded deference and rule was reasonably related to the penological interest of maintaining internal prison security); *Prison Legal News v. Lehman*, 272 F.Supp.2d 1151, 1161 (W.D.Wash.2003) (upholding prison's rule that publications must be mailed directly from the publisher because the rule satisfied the *Turner* factors and therefore is reasonably related to legitimate penological interests); *Montgomery v. Coughlin*, 194 A.D.2d 264, 605 N.Y.S.2d 569, 570 (N.Y.App.Div.1993) (upholding constitutionality of a "publisher-only" rule as applied to newspapers because the rule served legitimate penological interests).

[¶ 12]  Larson contends the prison rules are unconstitutional for several reasons. He argues the rules are unconstitutional because they do not reasonably relate to legitimate penological interests. Specifically, Larson argues rules forbidding gifts or alteration of property are unconstitutional because giving and receiving gifts and altering property do not violate or harm the order, security, or housekeeping of the prison. He argues the rules are arbitrary, unreasonable, and not remotely connected to the goal of preventing theft, strong-arming, escape, or assault. Larson also argues the rules conflict with North Dakota law by taking property without due process of law. He argues the prison has no right to take his property because the property was not stolen and he was not planning an escape or making a weapon.

[¶ 13]  The penitentiary argues the rules were adopted to address the penological interests of safety, security, and institutional order. Specifically, the penitentiary maintains the rules are intended to prevent theft, extortion, strong arm tactics, fraudulent and retaliatory accusations, and the conveyance of communications for gang purposes or to plan and carry out prohibited activities. Additionally, the penitentiary maintains the rules are intended to avoid the accumulation of property in a cell because the accumulation may be used to conceal contraband or may create a safety hazard.

[¶ 14]  "[C]onvicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison." *Bell v. Wolfish*, 441 U.S. at 545, 99 S.Ct. 1861.  But, "simply because prison inmates retain certain constitutional rights does not mean that these rights are not subject to restrictions and limitations." *Id.* Therefore, "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably

related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987).

[¶ 15] "[S]everal factors are relevant in determining the reasonableness of the regulation at issue." *Id.* "First, there must be a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it." *Id.* "Moreover, the governmental objective must be a legitimate and neutral one." *Id.* at 90, 107 S.Ct. 2254. A second factor "is whether there are alternative means of exercising the right that remain open to prison inmates." *Id.* "A third consideration is the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." *Id.* "When accommodation of an asserted right will have a significant 'ripple effect' on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials." *Id.* Fourth, "the absence of ready alternatives is evidence of the reasonableness of a prison regulation." *Id.* "This is not a 'least restrictive alternative' test: prison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint." *Id.* at 90–91, 107 S.Ct. 2254. We use these factors to determine whether these rules are reasonably related to legitimate penological interests.

[¶ 16] First, is the penitentiary rule rationally connected to a legitimate government interest put forward to justify it and is the rule neutral? There is a rational connection between maintaining penitentiary safety, security, and order and prohibiting inmates from exchanging property and receiving books, magazines, and other periodicals from sources other than the publisher. *Ford v. Schmidt,* 577

F.2d at 410; *Bell v. Wolfish,* 441 U.S. at 550–51, 99 S.Ct. 1861; *Ward v. Washtenaw Cty. Sheriff's Dept.,* 881 F.2d at 329. Allowing inmates to exchange property and to receive publications from outside sources other than directly from the publisher would facilitate prohibited communications secretly among prison inmates and increase the possibility they may receive prohibited communications or concealed weapons from outside the prison. *Ford v. Schmidt,* 577 F.2d at 410; *Bell v. Wolfish,* 441 U.S. at 550–51, 99 S.Ct. 1861; *Ward v. Washtenaw Cty. Sheriff's Dept.,* 881 F.2d at 329. Since the rule applies to all property, regardless of content, the rule is neutral. *Bell v. Wolfish,* 441 U.S. at 551, 99 S.Ct. 1861.

[¶ 17] Second, are there alternative means open to the inmates to exercise their rights? The penitentiary rule allows inmates to receive the type of property in question as long as they receive it on their own and do not exchange it with each other. Therefore, the rule allows the inmates an alternative means to exercise their rights. *Id.* at 552, 99 S.Ct. 1861.

[¶ 18] Third, what is the impact accommodation of the constitutional right will have on prison guards and other inmates, and on the allocation of prison resources in general? Courts are particularly deferential to the discretion of prison officials when the accommodation of a constitutional right will have a significant ripple effect on other inmates or on prison staff. *Turner v. Safley,* 482 U.S. at 90, 107 S.Ct. 2254. The rules are designed to maximize the safety and security of the inmates and prison staff. Prison officials maintain the rules are necessary to further the prison's ability to manage and control safety and security within the prison. Allowing prisoners to freely pass property to each other would diminish the safety and

security of other inmates and prison staff. *Ford v. Schmidt*, 577 F.2d at 410. Requiring inmates to receive publications directly from publishers makes it easier for prison staff to identify what property rightfully belongs to the proper inmates and makes it easier for prison staff to investigate claims of theft among inmates. *Bell v. Wolfish*, 441 U.S. at 550–51, 99 S.Ct. 1861. Without these rules, prison staff would be required to examine every publication traded between inmates to ensure that inmates are not communicating ideas or plans to carry out prohibited activities. *Id.* at 551, 99 S.Ct. 1861. The absence of these rules would increase the workload of prison staff and would diminish the safety and security of the inmates and the prison staff. *Id.* at 550–51, 99 S.Ct. 1861.

[¶ 19] Fourth, the reasonableness of a prison rule can be shown by the absence of ready alternatives. A prison rule is not required to be the least restrictive alternative and the absence of an alternative is evidence that the rule is reasonable. *Turner v. Safley*, 482 U.S. at 90, 107 S.Ct. 2254. It is difficult to identify alternatives to these rules which would effectively prevent theft, extortion, strong arm tactics, fraudulent and retaliatory accusations, and the conveyance of communications for gang purposes or to plan and carry out prohibited activities. *Avery v. Powell*, 806 F.Supp. at 11; *Montgomery v. Coughlin*, 605 N.Y.S.2d at 571. Any alternatives would likely require increased monitoring of interactions between inmates and significant monitoring of all items in the inmates' possession through increased cell searches. *Ward v. Washtenaw Cty. Sheriff's Dept.*, 881 F.2d at 329. The lack of obvious, reasonable alternatives to the rules is further evidence of their reasonableness.

[¶ 20] We hold the rules adopted by the penitentiary are reasonable and are reasonably related to legitimate penological interests. Thus the rules do not violate Larson's constitutional rights. Prison officials did not violate Larson's rights because the warden did not exceed his statutory authority in adopting and enforcing these rules. We affirm the district court's order denying Larson's application for a writ of certiorari.

[¶ 21] DALE V. SANDSTROM, DANIEL J. CROTHERS, MARY MUEHLEN MARING, and CAROL RONNING KAPSNER, JJ., concur.