Matter of Pine v Annucci (2021 NY Slip Op 06903)





Matter of Pine v Annucci


2021 NY Slip Op 06903


Decided on December 9, 2021


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered:December 9, 2021

532828
[*1]In the Matter of James R. Pine Sr., Petitioner,
v
Anthony J. Annucci, as Acting Commissioner of Corrections and Community Supervision, Respondent.

Calendar Date:September 3, 2021

Before:Garry, P.J., Egan Jr., Lynch, Clark and Pritzker, JJ.

James R. Pine Sr., Stormville, petitioner pro se.
Letitia James, Attorney General, Albany (Kate H. Nepveu of counsel), for respondent.



Egan Jr., J.
Proceeding pursuant to CPLR article 78 (transferred to this Court by order of the Supreme Court, entered in Albany County) to review a determination of the Superintendent of Green Haven Correctional Facility finding petitioner guilty of violating certain prison disciplinary rules.
Petitioner was charged in a misbehavior report with harassment and making threats against a correction officer following an incident that occurred as petitioner and other incarcerated individuals were reentering their cell block from the prison yard.[FN1] According to the report, after the correction officer reminded petitioner that he had legal mail to pick up, petitioner cursed at the officer and told him to leave him alone or he would "break [his] f***ing jaw." At the ensuing tier II disciplinary hearing, petitioner called three incarcerated individuals as witnesses, who testified that the officer cursed at petitioner and called him derogatory names and denied that petitioner had responded or cursed at the officer. Petitioner was found guilty of the charges and a penalty was imposed. Following petitioner's unsuccessful administrative appeal, he commenced this CPLR article 78 proceeding.
We confirm. The detailed misbehavior report, by itself, provides substantial evidence to support the determination of guilt (see Matter of Wimberly v Annucci, 185 AD3d 1364, 1365 [2020], lv denied 36 NY3d 903 [2020]). Contrary to petitioner's contention, the Hearing Officer was not required to call the author of the report as a witness, and petitioner could have, but did not, request that the author be called (see Matter of Williams v Kirkpatrick, 153 AD3d 996, 996 [2017]). The conflicting testimony from petitioner's witnesses that he had not engaged in the charged conduct presented a credibility issue for the Hearing Officer to resolve (see Matter of Torres v Annucci, 167 AD3d 1191, 1192 [2018]), as did petitioner's claim that the report was fabricated in retaliation for a grievance that he had filed against its author (see Matter of Coffey v Collado, 170 AD3d 1319, 1320 [2019]).[FN2] Although the Hearing Officer did not ultimately credit petitioner and his witnesses, the record reflects that he actively questioned them and considered their testimony, and otherwise conducted the hearing in a fair and impartial manner (see Matter of Mullins v Annucci, 177 AD3d 1061, 1062 [2019]). Petitioner's remaining contentions, including his claim that the Hearing Officer exhibited bias, have been considered and are either unpreserved for our review or lacking in merit.
Clark and Pritzker, JJ., concur.
Lynch, J. (concurring).
We concur in the decision but do find it necessary to address the issue of body camera footage. In his brief, petitioner posits that "if an [o]fficer is not in the bubble but instead is working the door and monitoring the hallway, he is supposed to be issued a body camera. [The correction officer] clearly was outside of the bubble on the night in question and was [*2]not following [p]olicy and [p]rocedure when he opened the hallway door to shout obscenities and issue threats against [me]." At the beginning of the hearing, petitioner requested the correction officer's body camera footage and the Hearing Officer acknowledged that he would make the request. As the hearing continued, one of petitioner's witnesses — another incarcerated individual — testified that the correction officer was not wearing a body camera. Nonetheless, the Hearing Officer indicated that he would still make the request and the hearing was adjourned pending a response. Once resumed, the Hearing Officer explained that he had "been informed by the Captain's [O]ffice that [the correction officer] was not assigned a body camera on that day" — an explanation consistent with the testimony of the witness (compare Matter of Caraway v Annucci, 190 AD3d 1198, 1199 [2021]). Almost two years ago, in Matter of Anselmo v Annucci (176 AD3d 1283 [2019]), the benefits of utilizing video recording technology were discussed (id. at 1285-1288 [Garry, P.J., concurring in part and dissenting in part]). Although we can accept the explanation here that the correction officer had not been assigned a body camera on the day of the incident, the perplexing question that remains is why not? A recording of actual events would certainly assist in resolving credibility disputes such as the one at hand, either exonerating or condemning the actions of the facility's employees (see id. at 1286-1287 [Garry, P.J., concurring in part and dissenting in part]). We are mindful that the Department of Corrections and Community Supervision has taken steps since 2018 to implement a body camera pilot program and that legislation has been introduced in the State Assembly and Senate to amend the Correction Law to require respondent to establish a "[b]ody camera for correction officers pilot program" at maximum security facilities (2021 NY Senate-Assembly Bill S6406, A6001). As is evident from this case, it appears that a comprehensive body camera program has yet to be established. In our view, such a program could greatly facilitate the resolution of disputes arising between correction officers and the general population of incarcerated individuals and, arguably, even prevent such altercations from arising in the first instance. In effect, expanding the use of body cameras can reasonably be expected to promote "the central objective of prison administration, safeguarding institutional security" (Bell v Wolfish, 441 US 520, 547 [1979]). We encourage both the Department of Corrections and Community Supervision and the Legislature to further address the issue.
Garry, P.J., concurs.
ADJUDGED that the determination is confirmed, without costs, and petition dismissed.



Footnotes

Footnote 1: An additional charge in the misbehavior report for violent conduct was dismissed prior to the disciplinary hearing.

Footnote 2: Our concurring colleagues encourage the Department of Corrections and Community Supervision to take further action on the use of body cameras in state prisons and, although we have our own views on that issue, we expressly decline to offer them here. In the absence of any direct challenge to that policy decision or a record that would give the parties an opportunity to fully explore the merits of the issue, we will exercise judicial restraint and not address it (see generally Turner v Safley, 482 US 78, 85 [1987]; Bell v Wolfish, 441 US 520, 547-548 [1979]).